**In the Matter of the Complaint of Jules S. CORNFIELD as Owner of the Vessel "Cara Ann" for Exoneration from or Limitation of Liability**

No. 02–CV–3331 (JS).

United States District Court, E.D. New York.

Nov. 23, 2004.

James E. Mercante, Esq., Rubin, Fiorella & Friedman LLP, New York City, for Petitioner.

John P. James, Esq., Friedman & James LLP, New York City, for Claimant.

*MEMORANDUM, DECISION AND ORDER AFTER BENCH TRIAL*

SEYBERT, District Judge.

### INTRODUCTION

Jules S. Cornfield ("Petitioner") brings a petition under the Shipowner's Limitation of Liability Act ("Limitation Act"), 46 U.S.C.App. § 183, for exoneration from or limitation of liability arising from an October 1, 2001 boating accident in which his son, Alan, and friend, Fred Hebig, perished. Donna Klein Cornfield ("Claimant"), the widow of Petitioner's son Alan, filed a claim against Petitioner for wrongful death and survival damages based on Petitioner's alleged negligence as owner and operator of the vessel on the day of the accident. This Court presided over a four-day bench trial concerning only the issue of liability.

Petitioner contends that, at all times relevant to the October 1, 2001 accident, he acted as a prudent mariner would under the circumstances. Petitioner maintains that throughout the fishing trip, the Cara Ann transited in waters that were navigable and suitable for fishing. According to Petitioner, the accident occurred because the Cara Ann was unexpectedly struck by a "rogue," or aberrational wave as the vessel transited back home.

Claimant alleges that Petitioner failed to exercise reasonable care for his son, Alan Cornfield, under the circumstances existing on October 1, 2001. According to Claimant, Petitioner failed to observe proper precautions, and never should have taken the Cara Ann into the ocean on the day of the accident. Additionally, Claimant maintains that Petitioner negligently

operated the Cara Ann on the day of the accident.

Based upon the evidence and arguments presented, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any of the findings of fact may be deemed conclusions of law, they also shall be considered conclusions. Likewise, to the extent that any of the conclusions of law may be deemed findings of fact, they shall be considered findings. *See Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405, 413–14 (1985) (noting the difficulty, at times, of distinguishing findings of fact from conclusions of law).

### FINDINGS OF FACT

On October 1, 2001 Petitioner Jules Cornfield (then age 73), Alan Cornfield (then age 38) and Fred Hebig (then age 70) went on a fishing trip aboard Petitioner's vessel, the "Cara Ann." Ex. D, Tr. 32, 100, 102. Each of the men was an experienced fisherman. Tr. 96–98, 100–01, 102–03, 106–07. Petitioner has navigated and fished in boats for almost forty years, and has fished the waters in and around Jones Inlet for almost thirty years. Tr. 98, 106–07. Additionally, Petitioner serves as a proctor for the Power Squadron, an organization that provides boating instruction courses. Tr. 96–97. Alan Cornfield had been on boats from the age of six, owned boats, and had been fishing with his father aboard the Cara Ann on numerous occasions prior to the accident. Tr. 101–03, 762. Fred Hebig owned his own boat and fished with Petitioner on several occasions over three years prior to the accident. Tr. 100–01.

The Cara Ann is a twenty-two foot fiberglass Angler "walk-around" boat with a two hundred horse-power engine. Tr. 99,

140. The vessel was (and still is) moored in Petitioner's backyard dock, which abuts Domar Canal. Tr. 38.

The day before the fishing trip, a Nor'easter had passed through the area. Tr. 277, 449. The National Weather Service forecast for October 1, 2001 called for gale winds (30–35 knots) from the Northeast, diminishing to 20–25 knots by early afternoon. Cl.'s Ex. U, Tr. 277, 449. The forecast also predicted seas of 8–11 feet, diminishing to 6–8 feet. Cl.'s Ex. U. High tide was set for approximately 7:30 a.m. and the moon was at full. Cl.'s Ex. V, Tr. 356, 447–48.

The gale forecast was not accurate. Tr. 365. Actual wind conditions in the vicinity of Jones Inlet were 12–20 knots between 10 a.m. and 11 a.m. and from 11 to 16 knots around 1 p.m.—the time of the accident. Tr. 741. Such winds are not gale strength. Tr. 326, 365, 741. Coast Guard surveillance videotapes show navigable waters inside Jones Inlet, with rough, treacherous seas in an adjacent area known as the breakers, or "West Bar." Pet'r's Exs. 12, 13, 14; Tr. 745–47. Conditions in the breakers can be rough while conditions outside the breakers are navigable. Tr. 286–87.

Petitioner never consulted any weather forecasts, checked any navigation charts, or consulted any other atmospheric data prior to departure. Tr. 36–37, 44–45. Instead, Petitioner looked out the back window of his home in order to make a preliminary assessment of atmospheric conditions. Tr. 112–114. He judged wind conditions by looking at the trees across the Domar Canal. Tr. 113. If the trees are blowing, Petitioner will not go out on the water. Tr. 113. Petitioner also observed the waters in Domar Canal to get an indication of how rough the seas were at that time. Tr. 113. If there are

whitecaps on the canal waters, Petitioner will not go out on the water. Tr. 113.

The Cara Ann set out at approximately 9:30 a.m., with Petitioner at the helm, and Alan Cornfield and Fred Hebig as passengers. Tr. 38. Before the three men left, Miriam Cornfield, Petitioner's wife, told Petitioner and her son not to go into the ocean. Tr. 763. Mrs. Cornfield typically gave this warning whenever either Petitioner or her son went out fishing. Tr. 763.

The vessel transited south from Petitioner's home through Domar Canal, then east through Reynolds Channel until the vessel neared Point Lookout, where it turned south towards Jones Inlet. Tr. 39. While navigating the Cara Ann, Petitioner failed to observe that two red pennants indicating the aforementioned gale warning were flying above the Coast Guard Station located in Jones Beach. Tr. 40, 277, 661.

Petitioner stopped the vessel in Jones Inlet, where the three men fished for approximately an hour and a half. Tr. 47. Sea conditions inside the Inlet were relatively calm while the men fished. Tr. 202, Pet'r's Ex. 11, 12, 13. The sky was overcast. Tr. 46. The fishing was not good so the three men headed out to the Atlantic Ocean in order to fish at a spot that they had fished at previously. Tr. 47, 202. The fishing spot was off the Lido Beach Hotel, in forty feet of water. Prior to heading out to the ocean, Petitioner ascertained the sea conditions by looking down Jones In-let. Tr. 114. If Petitioner sees breakers offshore, he will not go out in the ocean. Tr. 114.

To get to the ocean fishing spot, Petitioner first navigated the vessel south through the Inlet. Tr. 47. Then, Petitioner headed in a westerly direction until the Cara Ann reached its destination. Tr. 47. The three men fished off the Lido Beach Hotel for approximately an hour and a half. Tr. 50. Ocean conditions were relatively calm, with waves of approximately one foot. Tr. 49. The sky was overcast with occasional patches of sun breaking through. Tr. 46, 49. Around 1 p.m., the three men headed back to shore with Petitioner at the helm. Tr. 50. Petitioner charted an easterly course back towards Jones Inlet. Tr. 50. None of the three men were wearing life jackets as the vessel headed for home, and the ship's VHF radio was turned off. Tr. 51, 62.[1]

While in or near Jones Inlet, the Cara Ann was struck, unexpectedly, on its starboard side by a wave that knocked Alan Cornfield and Fred Hebig overboard, leaving Petitioner on board alone. Tr. 54, 57, 63, 74. Petitioner attempted to rescue the two men. Tr. 68, 74. Petitioner threw life jackets and a floating seat cushion to them. Tr. 68. Petitioner then oriented the boat westward so that he could attempt a rescue. Tr. 72, 216. Petitioner had his son in his arms and was attempting to lift him back aboard when the Cara Ann was struck by another wave, causing Petitioner to lose his grasp. Tr. 74, 216. After this,

---

**1.** Claimant relies on the recording of the Cara Ann's October 1, 2001 Mayday call for the proposition that both Alan Cornfield and Fred Hebig were wearing life jackets at the time the accident occurred. *See* Cl Ex. Q. Based on the evidence, the Court determines that the recording is not a reliable source for this premise. Testimony at trial indicated that, where multiple transmissions are being simultaneously made over VHF radio, certain transmissions may be cancelled out by others and transmissions received in one location may differ from transmissions received in other locations. Tr. at 503–04, 649–50. Because there were multiple parties responding on the Mayday tape, it is uncertain which transmissions Petitioner was receiving when he allegedly confirmed that both his son and Fred Hebig were wearing life jackets.

Petitioner lost sight of both his son and Fred Hebig. Tr. 218.

Petitioner then turned on the ship's VHF radio and called in a "Mayday." Tr. 75. The Coast Guard, Nassau Police Marine Aviation Unit and Hempstead Bay Constable responded to the distress call. Tr. 124–26, 258–63, 267. Coast Guard boats found the Cara Ann in the breakers, and escorted the vessel to safety. Cl.'s Ex. 38, Tr. 271. The bodies of Alan Cornfield and Fred Hebig were found approximately two hundred yards off Lido Beach in an area known as the "Mushrooms." Cl.'s Ex. 38, Tr. 246–47. They were pronounced dead at Long Beach Hospital. Ex. D–1.

## CONCLUSIONS OF LAW

■ Under the Limitation Act, a vessel owner may limit liability arising from a casualty to the value of the vessel if the casualty occurred "without privity or knowledge of the owner." 46 U.S.C. 183(a). While most often invoked by parties engaged in maritime commerce, the protections of the Limitation Act are also afforded to pleasure craft owners such as Petitioner. *See Kroemer v. Guglielmo (In re Guglielmo)*, 897 F.2d 58, 59–60 (2d Cir. 1990).

■ Where, as here, a negligence claim is filed in response to a petition for limitation or exoneration, a claimant carries the initial burden of establishing that negligence caused the injury. *See In re Complaint of James Miller*, 00–CV–8328, 2003 WL 22097484 *2 (S.D.N.Y. June 17, 2003) (citing *Guglielmo*, 897 F.2d at 61). Claimant must demonstrate by a preponderance of the evidence that Petitioner was negligent. *See Cigna Prop. & Casual Ins. Co. v. Bayliner Marine Corp.*, No. 92–CV–7891, 1995 WL 125386 (S.D.N.Y. Mar. 22, 1995).

■ If a claimant establishes that negligence caused the injury, then the burden shifts to the petitioner to establish that there was no neglect, privity or knowledge on his part. *See Complaint of Miller*, 2003 WL 22097484 at *2; *see also Flowers Transp. Inc. v. Lewis (In re Sec. Barge Line, Inc.)*, 644 F.Supp. 85, 90 (E.D.Mo. 1986).

■ Negligence under maritime law contains the same elements as under common law. *See Petition of the Kinsman Transit Co.*, 338 F.2d 708, 721 (2d Cir. 1964). Claimant must establish duty, breach of duty, and causation. *See id.* Under maritime law, a vessel owner owes passengers a duty to exercise reasonable care under the circumstances. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). This duty of care, however, does not render the vessel owner the insurer of his guest's safety. *See Monteleone v. Bahama Cruise Line, Inc.*, 838 F.2d 63, 64–65 (2d Cir.1988).

## EVIDENTIARY RULINGS

The parties raise two evidentiary issues. The first concerns a statement made by the decedent, Alan Cornfield, to his mother, pertaining to sea conditions he observed while driving to Petitioner's home on the morning of the accident. The second evidentiary issue concerns a statement made to Petitioner by Miriam Cornfield at the hospital, after the accident had occurred. The Court concludes that both statements are inadmissible hearsay.

### Alan Cornfield's Statement

Petitioner argues that decedent Alan Cornfield's statement is not hearsay because it is an admission by a party-opponent pursuant to Federal Rule of Evidence 801(d)(2)(A). Petitioner argues that Rule 801(d)(2)(A) applies because this action is

being brought by the decedent's estate on behalf of the decedent, rendering decedent a "party." *See Estate of Shafer*, 749 F.2d 1216, 1220 (6th Cir.1984); *Schroeder v. Bertolo*, 942 F.Supp. 72, 78 (D.Puerto Rico 1996). Alternatively, Petitioner argues that Alan Cornfield's statement falls within a "hearsay exception" provided by Rule 804(a)(4).

Claimant argues that Rule 801(d)(2)(A) is not applicable because Alan Cornfield is not a party to this action. Claimant contends that Alan Cornfield's statement is a privity-based admission that is more appropriately analyzed under Rule 807, the residual exception to the hearsay rule. *See Huff v. White Motor Corp.*, 609 F.2d 286, 290 (7th Cir.1979); Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 7019 (Interim Ed.2000). Because the statement does not satisfy residual exception criteria, Claimant argues it must be excluded.

■ The Court concludes that Alan Cornfield's statement does not fall within the ambit of Rule 801(d)(2)(A). The "question of whether a decedent's statement is properly admitted as an admission of a party opponent against the decedent's estate is properly treated as a question of privity based admissions." Wright & Miller, *Federal Practice & Procedure* § 7019 n. 1. At common law, statements made by those in privity with a party to the action were considered admissions of that party. *See Huff*, 609 F.2d at 290. As explained in *Huff v. White Motor Corporation*, Rule 801(d)(2)(A) altered the common law rule

by providing only for the admission of statements made by a party to the action. Privity-based admissions were abolished. *See Id.* at 290–91 ("At common law, privity based admissions have been generally accepted by courts ... The admissibility of privity-based admissions in the federal courts is now controlled, of course, by the Federal Rules of Evidence ... [Such admissions] ... are not among the specifically defined kinds of admissions that despite Rule 801(c) are declared not to be hearsay in Rule 801(d)(2)"); Wright & Miller, *Federal Practice & Procedure* § 7019. Notably, Rule 801(d)(2)(A) provides for several types of party-opponent admissions—such as adoptive admissions, or statements made by an agent—but does not include any provision concerning privity-based admissions. *See* Wright & Miller, *Federal Practice & Procedure* § 7019; *McCormick on Evidence* § 260 (5th Ed.1999).

■ While some courts have admitted decedents' statements as party-opponent admissions of the decedent's estate, the Court agrees with the rationale of the *Huff* court. *Compare Huff*, 609 F.2d at 290; *In re Teltronics Services, Inc.*, 29 B.R. 139, 165 (Bkrtcy.E.D.N.Y.1983); Wright & Miller, *Federal Practice & Procedure* § 7019; *with Phillips v. Grady County Bd. of County Comm'rs*, No. 02–CV–6306, 2004 WL 377664 (10th Cir.2004); *Estate of Shafer*, 749 F.2d at 1220. Alan Cornfield's statement, therefore, must be admitted pursuant to an alternative hearsay exception or exemption.[2]

---

2. Petitioner's attempt to limit the holding in *Huff* to the Seventh's Circuit's application of Indiana state law is unavailing. According to Petitioner, the *Huff* Court's determination that the statement of a decedent was not admissible against the decedent's estate as a party-opponent admission hinged on the fact that, under Indiana state law, a wrongful death action is not considered derivative. *See*

Pet'r's Proposed Conclusions of Law at 6. This position is wholly untenable, as the *Huff* Court explicitly stated that the Indiana wrongful death statute had no bearing on their decision. *Huff*, 609 F.2d at 290 ("We agree with McCormick that [the issue of whether or not a wrongful death action is considered derivative] should not be controlling, and that the exclusion by 'some courts'

None of the proffered hearsay exceptions are applicable. Petitioner argues that Alan Cornfield's statements come within an "exception" provided by Rule 804(a)(4). Rule 804(a)(4), however, simply defines the term "unavailable" for the purposes of applying certain hearsay exceptions found within Rule 804—such as prior testimony, or a statement under belief of impending death. *See* Fed.R.Evid. 804. The provision cited by Petitioner does not provide any independent basis for admissibility.

 The Court here is not persuaded that the residual exception is applicable. Rule 807 provides for the admission of evidence that possesses all the particularized guaranties of trustworthiness found in the other hearsay exceptions but does not fall within any listed exception. *See* Fed. R.Evid. 807. The test for admissibility under Rule 807 is onerous and the exception should only be invoked in exceptional circumstances. *Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 232 (2d Cir.1999). To be admissible under the residual exception, a statement "must be (1) trustworthy, (2) material, (3) more probative than other available evidence, and must fulfill (4) the interests of justice and (5) notice." *Silverstein v. Chase*, 260 F.3d 142, 148–49 (2d Cir.2001). Alan Cornfield's statement does not satisfy the residual exception criteria. Specifically, the statement is not material because it is unclear what waters Alan Cornfield was referring to when he made his comment. Nor does the Court find the statement any more probative on the issue of sea conditions than any of the other evidence adduced at trial. Finally, the Court does not find that the interests of justice compel inclusion.

Accordingly, Alan Cornfield's statement concerning sea conditions that he observed on the morning of the accident is excluded as hearsay pursuant to Rule 802.

### *Miriam Cornfield's Statements*

 Claimant seeks to admit out-of-court statements made by Miriam Cornfield at the hospital on the day of the accident. The statements were offered through Alan Klein, Claimant's father, who was at the hospital with Petitioner when Mrs. Cornfield arrived. According to Mr. Klein, Mrs. Cornfield admonished her husband for not listening to her earlier warnings, repeatedly stating "I warned you not go into the ocean!" Tr. 574. Claimant argues that the statements fall within the excited utterance exception, Rule 803(2). The Court concludes that the exception is not applicable and the statements are inadmissible hearsay.

Rule 803(2) provides for the admission of hearsay statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed.R.Evid. 803(2). The exception applies where one speaks "without the opportunity to reflect on the consequences of one's exclamation." *Brown v. Keane*, 355 F.3d 82, 90 (2d Cir.2004). Here, Mrs. Cornfield testified that after she received a phone call detailing the day's tragic events, "I had the brains to take a tranquilizer ... So I had time to sit around and think." Tr. 766–67. Such a statement is wholly inconsistent with proper application of Rule 803(2). Mrs. Cornfield had time to collect her thoughts, and affirmatively testified that she did so. *Id.* The Court finds her testimony credible. Accordingly, the exception is inapplicable and the statements are excluded as hearsay pursuant to Rule 802.

---

of statements of the deceased in wrongful death cases because the action is not 'derivative' is based on 'a hypertechnical concept f privity' ") (citations omitted).

## CLAIMANT'S CLAIMS

Claimant argues that, on the day of the accident, Petitioner failed to exercise reasonable care as owner and operator of the Cara Ann, causing Alan Cornfield's death. Claimant focuses on two general aspects of Petitioner's conduct. First, Claimant asserts that Petitioner was negligent in his decision to take the Cara Ann out on the seas on the day of the accident. Second, Claimant contends that Petitioner was negligent in his operation of the Cara Ann. For the reasons explained below the Court finds that Claimant has failed to establish that Petitioner was negligent.

### The Decision To Take The Vessel Out On The Water

Claimant contends that Petitioner was negligent in his failure to review forecasts, tides, moon-phase and charts prior to taking the Cara Ann out to sea. Claimant argues that Petitioner's failure to consult such forecasts, and subsequent decision to take the Cara Ann out to sea breached his duty of care to Alan Cornfield.

■ The Court declines Claimant's request for a "negligence per se" approach to Petitioner's failure to consult the aforementioned sources. While the Court recognizes that consulting forecasts, charts and other atmospheric data is an acceptable and learned way for a prudent mariner to ascertain sea conditions, it is not the only way. Petitioner apprized himself of the wind conditions by looking at the trees across the canal in his backyard. He observed the sea conditions by observing the waters in the canal in his backyard. Finally, Petitioner possessed the information that a chart could provide through his years of experience transiting the waters of Jones Inlet. Observing the conditions first-hand provided a reasonable-and arguably more accurate-method of determining whether sea conditions were prohibitive for navigation. Tr. 146–47, 365, 610, 628–29.

Moreover, the forecasts were inaccurate so the failure to consult them could not be considered the cause of the accident. There is no dispute that the gale winds foretold by the Coast Guard flags and weather forecasts never came to fruition. Tr. at 365, 741–42. Most compelling, the Coast Guard surveillance video shows, with the exception of the West Bar area, navigable conditions inside Jones Inlet. Cl.'s Ex. 12, 13, 14, Tr. 747. Even Claimant's expert, Ronald Alcus, did not take exception with Petitioner taking the Cara Ann out fishing in the Inlet at the time of the accident. Tr. at 533.

■ The decision to venture out into the ocean, however, presents a closer question. While there is substantial evidence indicating that sea conditions in the Inlet were not foreboding, the ocean may have been more dangerous. Notably, Petitioner testified that he makes the decision to venture out into the ocean by examining conditions from the Inlet after he has already left his backyard dock. Tr. 114. After reviewing the record, the Court finds that Claimant has failed to establish, by a preponderance of the evidence, that prevailing ocean conditions were such that Petitioner's decision to take the Cara Ann out on the ocean was negligent.

According to Nassau Police Department and Hempstead Bay Constable personnel at the scene of the accident, waters were rough, or very rough and not suitable for the Cara Ann. Tr. 132–34, 179–80, 255–56, 266, 280–83. Waves from four to six feet were consistently breaking in the West Bar. Tr. 132–33, 179–80, 282–284. The surveillance tape confirms the accuracy of these statements. Tr. 611, 615, Pet'r's Ex. 13. The rescue personnel testified that, further out in the ocean, there were four to

six foot swells. Tr. 133–34. Claimant's expert Ronald Alcus, who is experienced in maritime matters but has little experience navigating the waters in proximity to the Jones Inlet, opined that prevailing conditions were prohibitive for a boat the size of the Cara Ann. Tr. 464, 466–67.

Petitioner testified that, with the exception of the "rogue" wave, he did not encounter any dangerous seas as he transited in the ocean beyond the Inlet. Tr. 210. It is not disputed that the Cara Ann transited out to the fishing spot off the Lido Beach Hotel, and that the three men fished there for an hour or more without incident. Petitioner's expert, Captain Thomas Weiss, who has a great deal of familiarity with the waters surrounding the Jones Inlet, testified that there was nothing wrong with Petitioner's decision to transit into the ocean. Tr. 610.

▬▬ Though the Court finds that ocean conditions were not necessarily ideal on the day of the accident, Claimant has failed to establish that conditions in general were prohibitive for the Cara Ann. Claimant's evidence primarily focuses on conditions in the breakers, an area that can prove treacherous irrespective of prevailing sea conditions. Claimant has not offered sufficient evidence to rebut Petitioner's testimony that, with the exception of the "rogue wave," ocean conditions, in general, were suitable for fishing and navigation. Accordingly, Claimant has failed to establish that Petitioner's determination to take the Cara Ann out on the ocean, outside the breaker zone, was negligent.[3]

### Petitioner's Operation Of The Vessel

Claimant's assertion that Petitioner was negligent in his operation of the Cara Ann hinges primarily on the location of the accident. It is undisputed that the Cara Ann was heading back towards Jones Inlet when the accident occurred. The Parties disagree concerning the route Petitioner charted on the return voyage and the precise location of the accident. Claimant contends that, at the time of the accident, Petitioner was navigating inshore and west of the buoys through dangerous waters inshore of the West Bar. Petitioner maintains that the accident occurred as he was properly navigating through calm waters between the Jones Inlet buoys, specifically buoys 1 and 3. See Ex. 39.

After a careful review of the record, the Court is unable to determine the precise location of the accident. Thus, to the extent Claimant bases her negligence claim on Petitioner's navigation through the West Bar, her claim must fail.

Claimant offers testimony from several rescue personnel, indicating that the Cara Ann was in the West Bar at the time of their arrival on the accident scene. The Court notes that the rescue personnel were on the scene within minutes of receiving the Mayday call. In establishing the location of the accident, Claimant primarily relies on the accident report prepared by Nassau County Police marine accident investigator Joseph Fuoco. See Ex. S. Officer Fuoco's report and testimony at trial indicate that the Cara Ann was navigating in the breaker zone on the West Bar when the accident occurred. Ex. S, Tr. 360–62.

The accuracy of the location described in Officer Fuoco's report, however, is suspect. Officer Fuoco was not on the scene at the

---

3. The Court rejects the application of the doctrine of res ipsa loquitur where, as here, an unexpected or "rogue" wave is the cause of the accident. See Irwin v. United States, 236 F.2d 774, 775 (2d Cir.1956) ("Even the United States is not master of the sea and the wind, and the doctrine of res ipsa loquitur is inapplicable where the defendant does not have control of the agency causing the accident.")

time of the accident. He relied, at least in part, on a location, one quarter mile off shore, one mile west of Jones Inlet, provided by the rescue personnel who testified that they never saw the vessel on the day of the accident. Tr. 149, 183. Officer Fuoco testified that he picked what can only be described as an arbitrary measuring point in order to come up with his location. Tr. 397–98, 401–04. The location provided in the report does not account for any water currents prevailing at the time of the accident. Tr. 387, 392–93. At most, the Court finds that Officer Fuoco's report offers a "best guess" of the Cara Ann's location.

Petitioner's evidence also has shortcomings. Most notably, Petitioner appears to be confused about the location of the boat at the time of the accident. Petitioner maintains that he was in forty feet of water between the 1 and 3 buoys of Jones Inlet when the accident occurred, but the Court is unable to find such depths in that part of the channel where Petitioner insists he was transiting. See Exs. 38, 39. Nor can the Court find such depths anywhere on the chart provided to the Court. Petitioner relies on a Coast Guard audio recording of the Mayday call in which he declares that the Cara Ann was in "Jones Inlet," but on varying occasions, including at trial, Petitioner offered a seemingly contradictory locale, between the "Golf ball" water tower in Lido Beach and the Lido Beach Hotel. Compare Ex. Q, Tr. 207–08 with Tr. 77, Ex. L. Moreover, Petitioner questioned the reliability of the same recording concerning the depth of water the Cara Ann was in at the time of the accident. The Court notes, however, that Petitioner has consistently described sea conditions as navigable at the time of the accident and maintained that the wave that hit the Cara Ann was aberrational.

Petitioner's experts, Captain Weiss and Austin Dooley (a weather expert), explained how an aberrational wave might form within the navigable channel of Jones Inlet. Petitioner's expert Eric Andersen testified concerning how the current would affect the vessel and the bodies so as to explain the Cara Ann's position in the breakers at the time of rescue. Such testimony is helpful in explaining a plausible set of circumstances precipitating the accident, but is not persuasive evidence that the vessel was, in fact, in Jones Inlet between the 1 and 3 buoys when the accident occurred.

The Court finds most persuasive the Coast Guard surveillance video capturing sea conditions at the time of the accident. See Pet'r's Ex. 12. While the accident is not captured, the prevailing conditions in the West Bar are apparent. The waters were visibly treacherous. Captain Weiss testified that "To drive due east and stare for five miles at nonstop breaking waves for three adults, experienced mariners to go right through that is just [sic] makes absolutely no sense whatsoever." Tr. 656. The Court agrees. Petitioner was seventy-three years old at the time of the accident. It is not disputed that, due to a medical condition, Petitioner had to operate the Cara Ann at relatively slow speeds. At the time of the accident, visibility was good and the danger of the breaking waves inshore of the West Bar was readily apparent. Waves from four to six feet were consistently breaking in the West Bar area. While Petitioner has exhibited some confusion as to the precise location of the boat, the depth of water he was in at the time of the accident, and the landmarks relevant to his precise location, the Claimant has not offered sufficient evidence for the Court to conclude that Petitioner navigated the Cara Ann into this obviously treacherous area.

Claimant also contends that Petitioner was negligent concerning other aspects of the return trip. Claimant argues that Petitioner, as someone with "local knowledge" of the waters in proximity to Jones Inlet, should have known that, based on the changing of the tides, moon-phase, shoaling, and wind conditions, the timing of the return trip was not ideal because there was a greater chance of breaking waves. Additionally, Claimant's expert, Mr. Alcus testified that on the day of the accident, it was not prudent to navigate the Cara Ann broadside to the seas, as Petitioner allegedly did, during the return trip. Tr. at 482.[4] The Court rejects both arguments.

What Claimant, in effect, requests is for Petitioner to be held to the "heightened" standard of care once imposed upon ocean carriers. The Second Circuit, however, explicitly abandoned such a standard in favor of a general reasonableness under the circumstances standard. *See Monteleone v. Bahama Cruise Line, Inc.*, 838 F.2d 63, 64–65 (2d Cir.1988); *Rainey v. Paquet Cruises*, 709 F.2d 169, 170 (2d Cir. 1983).

■ This was not a situation involving a charter for hire or a common carrier. This was a fishing trip aboard a 21-foot "walk-around" fishing boat, undertaken by three experienced mariners. Under the circumstances, the Court finds nothing unreasonable about when, or how the Cara Ann was navigated during the return trip. *See Rainey*, 709 F.2d at 172 (Oakes, concurring) ("The circumstances of each case . . . vary, and the greater degree of the carrier's control or the lesser degree of the passenger's control over the factors causative to injury, the easier it is to find negligence"); *Merrill Trust Co. v. Bradford*, 507 F.2d 467, 468–69 (1st Cir.1974).[5]

Accordingly, the Court finds that Claimant has failed to demonstrate that Petitioner was negligent in his operation of the Cara Ann on October 1, 2001.

## *CONCLUSION*

For the reasons set forth herein, the Court dismisses Claimant's claim of negligence and finds Petitioner exonerated from all claims arising from the events of October 1, 2001. The Court directs the Clerk of the Court to enter judgment in favor of the Petitioner and mark this matter as CLOSED. The parties are directed to contact Mr. Charles Baran, Courtroom Deputy, to make arrangements for retrieval of all exhibits. If no arrangements have been made within thirty days of receipt of this Order, the exhibits will be discarded.

SO ORDERED.

---

4. Mr. Alcus testified that, whether or not it is prudent to orient a boat broadside to the seas is based on the prevailing conditions. Tr. 482. The Court finds it unclear, however, whether in determining the reasonableness of Petitioner's conduct, Mr. Alcus was presupposing that the conditions referred to were those existing inshore of the breakers, where the Court has determined that the accident did not occur.

5. Claimant also makes several confusing and alternative arguments concerning Petitioner's alleged negligence in providing life jackets. The Court rejects Claimant's arguments for the following reasons: on the day of the accident, Petitioner had the appropriate number of life jackets and flotation devices required by law, Tr. 196–97, 555; Petitioner kept the flotation devices in an accessible place, as any prudent mariner would, Tr. 556; and the decision of whether or not to put on a life jacket rests with the adult passengers. Tr. 426–27, 549, 559.