# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

               Respondent,

        v.

J.K.T.,

               Appellant.

DIVISION ONE

No. 78413-7-I

PUBLISHED OPINION

FILED: December 30, 2019

DWYER, J. — Juvenile J.K.T. was convicted of multiple counts of murder in the first degree for his participation, allegedly with his older brothers James and Jerome, in a 2016 shooting in the homeless encampment known as "The Jungle." J.K.T. appeals, contending that the trial court erred by ruling admissible a one-party consent recording of J.K.T. and his brothers discussing the shooting and by excluding hearsay statements that J.K.T. sought to admit in his defense. J.K.T. asserts that the recording of him and his brothers was obtained in violation of Washington's privacy act, chapter 9.73 RCW, and that it should have been excluded. He further asserts that the trial court improperly excluded exculpatory hearsay statements made against penal interest, thereby denying him the right to present a defense. There being no error in the trial court rulings, we affirm.

I

On January 26, 2016, five males wearing masks and dark clothing entered a section of the homeless encampment known as "The Jungle," located beneath a freeway in Seattle near the intersection of Interstates 5 and 90. The section of encampment they entered was occupied at the time by many people, including Phat Nguyen, Amy Jo Shinault, Tracy Bauer, Jeanine Brooks, and James Tran. Two of the masked individuals had guns and began shooting the occupants of the encampment, killing both Tran and Brooks. The masked attackers also shot Nguyen, Shinault, and Bauer. They survived.

The next day, Foa'l Tautolo, known as "Lucky," contacted the police, claiming to have information about the shootings. Lucky and his cousin, known as "Reno," went to the Seattle Police Department's headquarters to be interviewed. Lucky informed the police that his nephew, James, had called him and admitted to participating in the shooting because he needed money. Lucky also informed the police that he had, in the previous few days, seen his nephew with a .45 caliber handgun.[2] Lucky believed that James would be willing to discuss the shootings with him and Reno again in person.

The lead detective in the case, James Cooper, then prepared an application for a judicial authorization to make a one-party consent recording of James. In the application, Detective Cooper included the information he had received from Lucky regarding James admitting to the shooting and sought authorization to record him speaking about the shootings with Lucky. The

---

[2] The police had found matching caliber bullet shell casings at the scene of the shooting.

application also noted that James and his family were known to have been "staying near/under 4th Ave South and Edgar Martinez Way."[3] The application further stated that the conversations it sought authorization to record were "expected to occur somewhere in or around Seattle in one of the many homeless camps in the area. Because James, his brothers and their families are homeless and move around, it is impossible to predict where the conversation may take place[.] Investigators do believe they will remain in the area, and within King County."

The authorization order was signed by a King County superior court judge. The order stated that there was probable cause to believe that James had committed murder in the second degree and assault in the first degree.

The next day, Lucky and Reno were wired and dropped off near James's encampment on 4th Avenue South in Seattle. Lucky had arranged, over the telephone, to meet James at James's encampment near "the stadium."[4] The recording occurred near an underpass across the street from what Lucky referred to as "like a Goodwill, but it's not a Goodwill."[5] James, Jerome, and J.K.T. were present during the conversation and made statements leading officers to believe that they all actively participated in the shooting.

J.K.T. was subsequently charged with felony murder in the first degree predicated on robbery and assault. J.K.T. moved to suppress the one-party

---

[3] The cross street in the application contained a typographical error. There is no Edgar Martinez Way that intersects with 4th Avenue South; instead, the name of the street is Edgar Martinez Drive South.

[4] There are actually two stadiums located adjacent to one another on 4th Avenue South. It is unclear from the record to which stadium Lucky was referring.

[5] It appears that Lucky was referencing the Salvation Army Family Store, as it is the only store on 4th Avenue South across the street from the stadiums that matches Lucky's description.

consent recording in which he and his brothers discussed the shooting, arguing that it was obtained in violation of Washington's privacy act. The trial court denied the motion. J.K.T. subsequently and unsuccessfully sought to exclude James's and Jerome's statements in the recording on the grounds that they were inadmissible hearsay and violated his right, guaranteed by the Sixth Amendment to the United States Constitution, to confront the witnesses against him.[6]

During his bench trial, J.K.T. sought to offer into evidence that which he asserted constituted exculpatory hearsay statements made by others against their penal interest. Specifically, he sought to admit the hearsay statements of two individuals, known as Ace and Francis, who had purportedly informed one of the shooting victims, Bauer, that they, and not J.K.T. and his brothers, were active participants in the shooting. The trial court concluded that these statements were insufficiently reliable to warrant their admission into evidence.

The juvenile court found J.K.T. guilty of two counts of murder in the first degree and three counts of assault in the first degree. The court imposed a manifest injustice disposition that rendered J.K.T. into the custody of the juvenile rehabilitation authority until he is 20 years old. Treatment-related supervision is to follow his release.

J.K.T. appeals.

---

[6] J.K.T. does not appeal from the ruling that his right to confront the witnesses against him, as guaranteed by the United States Constitution, did not bar the admission of his brothers' statements in the recording.

II

J.K.T. primarily contends that his conviction must be reversed because the trial court erroneously admitted into evidence the one-party consent recording of him and his brothers discussing the shooting. This is so, J.K.T. asserts, because (1) the recording was obtained in violation of Washington's privacy act, and (2) admission of the recorded statements of J.K.T.'s brothers violated J.K.T.'s right to confront the witnesses against him as guaranteed by article I, section 22 of the Washington Constitution, a contention raised for the first time on appeal. We disagree.

A

J.K.T. contends that the one-party consent recording showing J.K.T. and his brothers discussing the shooting was obtained in violation of the privacy act because (1) the application for the authorization to record without the consent of all parties to the conversation does not establish probable cause that J.K.T. had committed a crime, and (2) the application for the order authorizing the recording and the order authorizing the recording did not set forth a specific enough place as to where the recording would occur so as to satisfy the requirements of the privacy act.

We review the meaning of a statute de novo. State v. Breazeale, 144 Wn.2d 829, 837, 31 P.3d 1155 (2001). Our "fundamental objective is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then [we] must give effect to that plain meaning as an expression of legislative intent." Dep't of Ecology v. Campbell & Gwinn, LLC,

5

146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). When interpreting a provision of our state's code, the provision is to "be liberally construed, and shall not be limited by any rule of strict construction." RCW 1.12.010. Where a statute does not define a term, we may look to dictionary definitions to assist in determining the plain meaning of a statute. LaCoursiere v. Camwest Dev., Inc., 181 Wn.2d 734, 741-42, 339 P.3d 963 (2014).

Washington's privacy act protects the privacy rights of individuals and is one of the most restrictive electronic surveillance laws in the country. State v. Roden, 179 Wn.2d 893, 898, 321 P.3d 1183 (2014). The act generally prohibits the admission at trial of recorded conversations or communications obtained without the consent of all parties to the conversation. RCW 9.73.030; Roden, 179 Wn.2d at 898. "Failure to suppress evidence obtained in violation of the act is prejudicial unless, within reasonable probability, the erroneous admission of the evidence did not materially affect the outcome of the trial. State v. Christensen, 153 Wn.2d 186, 200, 102 P.3d 789 (2004) (citing State v. Porter, 98 Wn. App. 631, 638, 990 P.2d 460 (1999)).

RCW 9.73.090, however, sets forth exceptions to the general rule prohibiting the recording of conversations or communications without the consent of all parties. One such exception is that

> [i]t shall not be unlawful for a law enforcement officer acting in the performance of the officer's official duties to intercept, record, or disclose an oral communication or conversation where the officer is a party to the communication or conversation or one of the parties to the communication or conversation has given prior consent to the interception, recording, or disclosure: PROVIDED, That prior to the interception, transmission, or recording the officer shall obtain written or telephonic authorization from a judge or magistrate, who

shall approve the interception, recording, or disclosure of communications or conversations with a nonconsenting party for a reasonable and specified period of time, if there is probable cause to believe that the nonconsenting party has committed, is engaged in, or is about to commit a felony.

RCW 9.73.090(2).

RCW 9.73.090(2) further states that "[a]ny recording or interception of a communication or conversation incident to a lawfully recorded or intercepted communication or conversation pursuant to this subsection shall be lawful and may be divulged."

An application for an order authorizing a one-party consent recording must comply with the requirements set forth in RCW 9.73.130. State v. D.J.W., 76 Wn. App. 135, 144-45, 882 P.2d 1199 (1994), aff'd, 129 Wn.2d 211, 916 P.2d 384 (1996). These statutory safeguards protect against "unfettered discretion in the hands of the recording party and against the issuance of authorizations to record in the absence of proper circumstances." D.J.W., 76 Wn. App. at 145. An order based on a faulty application, not in compliance with RCW 9.73.130, is unlawful, and any recording authorized by such an order is inadmissible as evidence. State v. Kichinko, 26 Wn. App. 304, 310-11, 613 P.2d 792 (1980). The following information must be included in an application for an order authorizing a one-party consent recording:

(1) The authority of the applicant to make such application;
(2) The identity and qualifications of the investigative or law enforcement officers or agency for whom the authority to record a communication or conversation is sought and the identity of whoever authorized the application;
(3) A particular statement of the facts relied upon by the applicant to justify his or her belief that an authorization should be issued, including:

7

(a) The identity of the particular person, if known, committing the offense and whose communications or conversations are to be recorded;

(b) The details as to the particular offense that has been, is being, or is about to be committed;

(c) The particular type of communication or conversation to be recorded and a showing that there is probable cause to believe such communication will be communicated on the wire communication facility involved or at the particular place where the oral communication is to be recorded;

(d) The character and location of the particular wire communication facilities involved or the particular place where the oral communication is to be recorded;

(e) A statement of the period of time for which the recording is required to be maintained, if the character of the investigation is such that the authorization for recording should not automatically terminate when the described type of communication or conversation has been first obtained, a particular statement of facts establishing probable cause to believe that additional communications of the same type will occur thereafter;

(f) A particular statement of facts showing that other normal investigative procedures with respect to the offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ;

(4) Where the application is for the renewal or extension of an authorization, a particular statement of facts showing the results thus far obtained from the recording, or a reasonable explanation of the failure to obtain such results;

(5) A complete statement of the facts concerning all previous applications, known to the individual authorizing and to the individual making the application, made to any court for authorization to record a wire or oral communication involving any of the same facilities or places specified in the application or involving any person whose communication is to be intercepted, and the action taken by the court on each application; and

(6) Such additional testimony or documentary evidence in support of the application as the judge may require.

RCW 9.73.130.

"A judge issuing an intercept order has considerable discretion to determine whether the statutory safeguards [of the privacy act] have been satisfied." Porter, 98 Wn. App. at 634. Thus, when reviewing an application for

an order authorizing a one-party consent recording, we "'decide if the facts set forth in the application were minimally adequate to support the determination that was made.'" State v. Manning, 81 Wn. App. 714, 718, 915 P.2d 1162 (1996) (internal quotation marks omitted) (quoting State v. Knight, 54 Wn. App. 143, 150-51, 772 P.2d 1042 (1989)).

1

J.K.T. asserts that the application filed herein for an order authorizing a one-party consent recording did not establish probable cause as to J.K.T., as required by RCW 9.73.090(2), and that it is therefore inadmissible against him. However, J.K.T. also concedes that the application established probable cause sufficient to authorize the recording of J.K.T.'s brother, James. We agree with the parties that probable cause as to James was established. Accordingly, under the circumstances herein, no such finding as to J.K.T. was required.

The recording of utterances made by James was plainly supported by a finding of probable cause. In addition, RCW 9.73.090(2) is clear that conversations or communications recorded "incident to a lawfully recorded or intercepted communication or conversation pursuant to this subsection shall be lawful and may be divulged." The parties dispute whether this language applies to J.K.T. and (impliedly) Jerome, disagreeing as to the meaning of the word "incident." The State essentially contends that "incident" means "ancillary" or "as part of," and that the admission of the recording of J.K.T. was proper because it was obtained as part of a lawful recording of James. In contrast, J.K.T. asserts that "incident" means, essentially, "accidentally," and that because Detective

9

Cooper planned or hoped to record James and his brothers together, the recording of J.K.T. was not accidental, thus rendering the contents of the recording inadmissible against J.K.T. The State has the better argument.

Because there is no statutory definition of "incident," we look to dictionary definitions to determine the meaning of the word. LaCoursiere, 181 Wn.2d at 741-42. Webster's Third New International Dictionary defines "incident" as "something dependent upon, appertaining or subordinate to, or accompanying something else of greater or principal importance." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1142 (2002). Similarly, Black's Law Dictionary defines "incident" as "[d]ependent on, subordinate to, arising out of, or otherwise connected with (something else, usu. of greater importance)." BLACK'S LAW DICTIONARY 911 (11th ed. 2019).

It is apparent from these definitions that the State's view of the statutory language is correct. Here, "incident" does not mean "accidental." Thus, so long as the authorization to record James was supported by probable cause, which it was, the incidental recording of J.K.T. need not be independently supported by probable cause as to him in order to be admissible at trial against him.[7]

---

[7] J.K.T. also asserts that three material misrepresentations in the application "form no basis for establishing any probable cause to surreptitiously record [J.K.T.]." Because probable cause was not required to be established as to J.K.T., this argument fails. Furthermore, J.K.T.'s asserted material misrepresentations were not, in fact, material to the court's finding of probable cause as to James.

First, J.K.T. asserts that the application's description of James and his family as being "involved" in previous unsolved crimes was a material misrepresentation because it painted James's family as the kind of people who would commit crimes. Given that the application stated that James confessed to the shooting, was known to possess a gun with bullets matching those removed from one of the victims of the shooting, and resembled the, admittedly vague, physical description of the shooters given by witnesses, it is clear that probable cause was not dependent on any previous potential involvement in or association with criminal activity.

Second, J.K.T. asserts that the application omitted material information regarding Lucky's and Reno's criminal history and that they were compensated for the information they provided.

2

J.K.T. next asserts that both the application for the order authorizing a one-party consent recording and the order itself did not set forth a sufficiently specific location for the place where the recording would occur to satisfy the requirements of the privacy act. Although he did not clearly articulate that which he would consider a sufficiently specific location, it appears that J.K.T. believes that something approximating the specificity of a street address is required to be included in both the application and the order authorizing a recording, and that the application's inclusion of a cross street and a description of the location as being a homeless encampment was insufficient. In response, the State asserts that (1) the application sufficiently informed the authorizing judge of the character and location of the place where the recording would occur by informing the judge that the recording would take place at a homeless encampment and identifying the cross street near the encampment in which James was last known to be staying, and (2) the order did not need to set forth a specific location where recording was authorized. We conclude that the authorization and the

---

However, J.K.T. also acknowledges that the application stated that Lucky and Reno have criminal histories. Additionally, the fact that Lucky and Reno could benefit from providing assistance in an active homicide investigation would lead to an inference that their evidence would be credible—providing inaccurate information would not help them receive favorable treatment. The probable cause analysis was plainly not affected by the omission of the specifics of Lucky's and Reno's criminal histories or speculation about how much time off of potential sentences they stood to gain. In addition, it is plainly wrong to suggest that the judge authorizing the recording was unaware that criminal informants generally want to receive some form of favor in exchange for their assistance.

Third, J.K.T. asserts that one line in the application, stating that witnesses to the shooting could not identify the shooters, materially misinformed the authorizing court because one of the victims did identify her shooter as a man known as Juice. However, the application expressly states that "one of the males involved in the shooting was possibly a Samoan male known only by the street name of 'Juice.'" Plainly, the application did not misinform the court on this point.

application for authorization herein complied with the requirements of the privacy act regarding inclusion of the place where the recording would occur.

Under the privacy act, an order authorizing a one-party consent recording must (1) be obtained prior to making the recording, (2) be limited to a "reasonable and specified period of time," and (3) be supported by probable cause to believe that the nonconsenting party has committed, is committing, or is about to commit a felony. RCW 9.73.090(2). There is no requirement that an order authorizing a one-party consent recording delineate the place where recording is authorized.[8] Knight, 54 Wn. App. at 149.

Under RCW 9.73.130(3)(d), however, applications for an order authorizing a one-party consent recording must include a particular statement of "the facts relied upon by the applicant to justify his or her belief that an authorization should be issued, including: . . . (d) The character and location of the particular wire communication facilities involved or the particular place where the oral communication is to be recorded."[9] J.K.T. appears to assert that this statutory

---

[8] J.K.T. contends, without citation to authority, that an order authorizing a one-party consent recording must include a particular location of the place where recording is authorized because a particular place is required, under RCW 9.73.130, to be included in the application for an order. This is wrong. RCW 9.73.130 plainly does not set forth any requirements for an order authorizing a one-party consent recording; it sets forth only requirements for the application.

[9] This requirement applies to all applications seeking authorization under RCW 9.73.090 except in cases where there is probable cause "to believe that the communication or conversation concerns the unlawful manufacture, delivery, sale, or possession with intent to manufacture, deliver, or sell, controlled substances . . . or legend drugs . . . or imitation controlled substances." RCW 9.73.090(5). In such cases a judge may authorize a one-party consent recording

> even though the true name of the nonconsenting party, or the particular time and place for the interception, transmission, recording, or disclosure, is not known at the time of the request, if the authorization describes the nonconsenting party and subject matter of the communication or conversation with reasonable certainty under the circumstances.

RCW 9.73.090(5).

J.K.T. asserts that this subsection and RCW 9.73.210(2) and RCW 9.73.230(2)(e) show that the legislature relaxed a particularity requirement in RCW 9.73.130 for specific crimes, allowing a judge to authorize recordings with only an imprecise location for specific crimes

language requires that an application include either the character and location of the particular wire communication facilities involved, or, the particular place where the oral communication is to be recorded. This misreads the statute. Under the series qualifier canon, "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, at 147 (2012). Thus, the prepositive modifier in RCW 9.73.130(3)(d), "character and location," applies to both the wireless communication facilities and to the particular place where the oral communication is to be recorded.[10]

In determining whether an application has sufficiently identified the character and location of the place where the recording of an oral communication

---

relating to commercial sexual abuse of a minor and drug trafficking and manufacture. J.K.T. is wrong. These statutes do not change the level of detail about a place required in an application for a judicial order authorizing recording. First, RCW 9.73.210 and RCW 9.73.230 have nothing to do with judicial authorizations to make one-party consent recordings. Rather, they address the requirements for a chief law enforcement officer to authorize a one-party consent recording and have no bearing on RCW 9.73.130. Second, RCW 9.73.090(5) does not change the level of specificity required to be included in an application regarding the intended place for a one-party consent recording. Instead, it eliminates the requirement that a place be included at all. No place is necessary so long as "the authorization describes the nonconsenting party and subject matter of the communication or conversation with reasonable certainty under the circumstances." RCW 9.73.090(5). There is no requirement that a less specific or imprecise place be included. Thus, RCW 9.73.090(5) does not provide any insight into the degree of specificity the legislature intended to be required under RCW 9.73.130(3)(d).

[10] If, as J.K.T. suggests, the statute required an application to include only a specific street address for where recording is expected to occur, a judge considering whether to grant authorization to record would be unable to properly consider the risk of recording innocent conversations or to require appropriate safeguards when granting authorization. For example, there is a different level of risk between recording at a therapist's office, a church, a closed door legislative session, a baseball game, or a private home or office, but a street address would not properly inform the judge of these differences. Furthermore, even some locations with street addresses, such as state parks, cover many square miles of area quite distant from the location of their official street address. A street address, while sometimes useful for assisting a judge in determining whether to grant authorization, is merely one possible means of informing the judge of the location of the particular place where a recording is expected to occur.

13

will occur, we are conscious of our decision in D.J.W., stating that the requirements set forth in RCW 9.73.130 provide protection against "unfettered discretion in the hands of the recording party." 76 Wn. App. at 145. Thus, our inquiry is to determine whether the application sufficiently identified the character and location of the particular place where recording of the oral communication was expected to occur such that it was not seeking unfettered discretion to record.[11]

However, the privacy act does not set forth definitions for "character and location" nor for "particular place." Thus, we again look to dictionary definitions to assist in ascertaining the meaning of the statutory language. LaCoursiere, 181 Wn.2d at 741-42. Webster's Third New International Dictionary defines "character" as "one of the essentials of structure, form, materials, or function that together make up and usu. distinguish the individual," and as the "main or essential nature esp. as strongly marked and serving to distinguish." WEBSTER'S, supra, at 376. "Location" is defined as "a position or site occupied or available for occupancy (as by a building) or marked by some distinguishing feature" and as "an area or tract of land." WEBSTER'S, supra, at 1327. "Particular" is defined as "of, relating to, or being a single definite person or thing as distinguished from some or all others." WEBSTER'S, supra, at 1646. And "place" is defined as "an indefinite region or expanse" and as "a particular portion of a surface."

---

[11] We therefore reject the State's assertion at oral argument that it was sufficient for the application to describe the recording equipment used to make the recording and to state that the equipment was placed on Lucky and Reno. Such a description clearly does not place any actual limits on recording because Lucky and Reno could carry the equipment attached to their persons almost anywhere.

WEBSTER'S, supra, at 1727. Thus, RCW 9.73.130(3)(d) requires an application to include a description of the nature and position of a region, or area, such that it can be identified and distinguished from other areas.

Although of limited help, two cases provide some insight into that which constitutes a sufficient description of the character and location of the particular place where an oral communication is to be recorded. See Porter, 98 Wn. App. 631; Knight, 54 Wn. App. 143. However, neither of these cases determined that which constitutes a sufficient description of the "character and location" of the "particular place where the oral communication is to be recorded."

In Knight, the defendant, having been charged and convicted of two counts of delivery of a controlled substance, asserted on appeal that the application for the authorization to record him, on multiple occasions, delivering cocaine to an undercover officer did not include a sufficient description of the location of all the places at which the police anticipated the recordings would occur. 54 Wn. App. at 149. Division Three rejected this argument, noting that "[t]he application specifically identified two locations, one of which was the address where the recorded communications actually occurred."[12] Knight, 54 Wn. App. at 149. Thus, it is clear that an application satisfies the location requirements of RCW 9.73.130(3)(d) if it included the location of the place where the recording actually occurs, regardless of whether it included the locations of

---

[12] The legislature had not yet added subsection (5) to RCW 9.73.090 at the time the police applied for and obtained an order authorizing the recording of Knight. See former RCW 9.73.090, LAWS OF 1986, ch. 38, § 2. Thus, even though Knight was being recorded as part of an investigation into the crime of delivery of a controlled substance, the application was still required to include the character and location of the particular place where the communication was to be recorded under RCW 9.73.130.

15

other places the police may have anticipated recording.

In Porter, the defendant was charged and convicted with possession of methamphetamine, but asserted on appeal that the application for authorization to record him discussing obtaining methamphetamines did not sufficiently describe the particular place where his communications would be recorded. 98 Wn. App. at 634, 637. The application stated that recordings would occur in unknown locations in Yakima County or adjacent counties.[13] Porter, 98 Wn. App. at 633. In response, the State asserted that no location was required to be included in the application at all because of RCW 9.73.090(5). Porter, 98 Wn. App. at 637.

The court rejected the State's argument, noting that Porter was charged only with possession, not with any intent to manufacture, deliver, or sell controlled substances, and that, therefore, RCW 9.73.090(5) was inapplicable. Porter, 98 Wn. App. at 637. It appears that the State did not present any argument that its application satisfied the requirements of RCW 9.73.130(3)(d), as the court did not discuss any such contention. Ultimately, the court concluded that the application failed to satisfy several of the requirements set forth in RCW 9.73.130, including the requirement in subsection (3)(d). Porter, 98 Wn. App. at 632. Thus, Porter stands for the unremarkable proposition that an application that provides only that the recording may occur in any "unknown location" within any one of nine different counties is insufficient to satisfy the requirements of RCW 9.73.130(3)(d).

---

[13] Yakima County is adjacent to eight counties: Benton, Grant, King, Kittitas, Klickitat, Lewis, Pierce, and Skamania.

We now consider the application for an authorization to record submitted herein. The application stated that James and his brothers had been "staying near/under 4th Ave South and Edgar Martinez Way" in Seattle.[14] It further stated that the recordings were "expected to occur somewhere in or around Seattle in one of the many homeless camps in the area." The application noted that because James and his family were homeless "and move around, it is impossible to predict where the conversation may take place[.] Investigators do believe they will remain in the area, and within King County." After receiving authorization, Lucky and Reno met with James and his brothers at the homeless encampment the brothers were staying in at the time. Although Lucky was unable to identify a street address for the encampment, he explained that it was near the stadium and across the street from a clothing donation store similar to a Goodwill. This location is approximately a block and a half north of the intersection of 4th Avenue South and Edgar Martinez Drive South.[15]

We conclude that this information was minimally adequate to satisfy the requirement of RCW 9.73.130(3)(d) that the application set forth the character and location of the particular place where recording is expected to occur. The application accurately stated that recording was expected to occur in a homeless encampment in Seattle. Additionally, the recording actually took place only a

---

[14] Again, there is no Edgar Martinez Way that intersects with 4th Avenue South in Seattle. Instead, there is an Edgar Martinez Drive South that intersects with 4th Avenue South.

[15] Location of Salvation Army Family Store & Donation Center, GOOGLE MAPS, https://www.google.com/maps/place/The+Salvation+Army+Family+Store+%26+Donation+Center/@47.592941,-122.3322453,16z/data=!4m8!1m2!2m1!1sSalvation+army+family+store+4th+ave+s!3m4!1s0x0:0x623e820aa957ec22!8m2!3d47.594304!4d-122.3284534 [https://perma.cc/CEG9-C2PQ].

17

block and a half away from the cross street identified in the application.[16] Even read at its broadest, the application herein specified that the recording was expected to occur in a homeless encampment in Seattle, and certainly within King County. This is far more specific than the language—describing unknown locations in one of nine counties—rejected as insufficient in Porter. Contrary to J.K.T.'s assertions, this application plainly did not seek "unfettered discretion" to record anywhere in King County but, rather, sought authorization to record James at his homeless encampment in Seattle, likely located near the intersection of 4th Avenue South and Edgar Martinez Drive South. This is exactly what occurred. The application satisfied the requirements of RCW 9.73.130(3)(d). The trial court properly ruled that this was so.

B

J.K.T. next contends that the admission of the recording of his brothers discussing the shooting violated his right to confront the witnesses against him, guaranteed by article I, section 22 of the Washington Constitution.[17] In response, the State notes that J.K.T. did not raise this argument before the trial court and asserts that J.K.T. has therefore forfeited any right to raise this argument on appeal. The State is correct.

---

[16] Given the close proximity and the nebulous nature of homeless encampments, in that they do not typically have set street addresses or boundaries, it is possible that James was living in the same homeless encampment at the time of the recording as when he was observed at the cross streets identified in the application. Even were this not so, it is clear that the recording took place in close proximity to the cross streets identified in the application.

[17] To reiterate, J.K.T. does not challenge the trial court's ruling that admission of the recording did not violate J.K.T.'s right to confront the witnesses against him as guaranteed by the Sixth Amendment to the United States Constitution. His contention on appeal is solely that his right to confront witnesses, as guaranteed by the Washington Constitution, was violated. He did not raise this argument in the trial court.

As our Supreme Court noted in State v. Burns, 193 Wn.2d 190, 207, 438 P.3d 1183 (2019), both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution afford the accused the right to be confronted with the witnesses against him or her. However, approving of our ruling in State v. O'Cain, 169 Wn. App. 228, 279 P.3d 926 (2012), the Supreme Court adopted "a requirement that a defendant raise an objection at trial or waive the right of confrontation." Burns, 193 Wn.2d at 210-11. The court explained that "[w]here a defendant does not object at trial, 'nothing the trial court does or fails to do is a denial of the right, and if there is no denial of a right, there is no error by the trial court, manifest or otherwise, that an appellate court can review.'" Burns, 193 Wn.2d at 211 (quoting State v. Fraser, 170 Wn. App. 13, 25-26, 282 P.3d 152 (2012)).

J.K.T. concedes that he did not raise his state constitutional confrontation clause claim in the trial court, but asserts that we should nevertheless consider his argument on appeal because it satisfies the requirements of RAP 2.5(a)(3).[18] This is contrary to Burns.[19] Burns, citing to both the federal and state confrontation clauses, is clear that a defendant forfeits the right to confront the witnesses against him or her if the defendant does not assert such a right at trial by raising an objection. 193 Wn.2d at 210-11. Furthermore, as Burns notes, without an objection, there simply is no denial of the defendant's right to confront witnesses and there can be no error. Thus, there was no denial of J.K.T.'s right

_____

[18] This rule permits review of errors raised for the first time on appeal when the error is a "manifest error affecting a constitutional right." RAP 2.5(a)(3).

[19] J.K.T. does not even cite to Burns in his briefing and makes no effort to argue that it is inapplicable herein. We follow Burns.

to confront the witnesses against him as guaranteed by the Washington Constitution.

III

J.K.T. next contends that the trial court erred when it prohibited him from eliciting testimony from Bauer as to hearsay statements uttered by Ace and Francis regarding the shooting. According to J.K.T., the trial court's application of a nine-factor test promulgated by our Supreme Court for determining the reliability of hearsay statements made against penal interest—used to determine whether they are admissible under ER 804(b)(3)—was improper because the test is premised on a now overruled United States Supreme Court decision setting forth reliability requirements for inculpatory statements from witnesses. J.K.T. further asserts that the hearsay statements made against penal interest that he sought to admit satisfied the requirements of ER 804(b)(3), and, therefore, that exclusion of the statements violated J.K.T.'s constitutional right to present a defense. In response, the State asserts that J.K.T. is mistaken that the nine-factor reliability test is premised on now overruled United States Supreme Court precedent, that J.K.T.'s proffered hearsay statements are unreliable under the test, and that exclusion of the statements was therefore proper and not a violation of J.K.T.'s right to present a defense. The State has the better arguments.

"Decisions involving evidentiary issues lie largely within the sound discretion of the trial court and will not be reversed on appeal absent a showing of abuse of discretion." State v. Castellanos, 132 Wn.2d 94, 97, 935 P.2d 1353

(1997). Thus, a trial court's decision on the reliability of a hearsay statement made against penal interest, under ER 804(b)(3), is reviewed for an abuse of discretion. State v. McDonald, 138 Wn.2d 680, 693, 981 P.2d 443 (1999).

Hearsay statements are generally not admissible, but there are exceptions. ER 802. One such exception is set forth by ER 804(b)(3):

> **(b) Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> (3) *Statement Against Interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. In a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

A hearsay statement made against penal interest is admissible when three requirements are met: (1) the declarant is unavailable to testify, (2) the declarant's statement must tend to subject him or her to criminal liability, and (3) the statement must be corroborated by circumstances indicating its trustworthiness. State v. Valladares, 99 Wn.2d 663, 668, 664 P.2d 508 (1983). Our Supreme Court long ago established that to determine whether a hearsay statement against interest satisfies the requirement of trustworthiness, courts should assess a statement's reliability using a nine-factor reliability test. State v. Roberts, 142 Wn.2d 471, 497-98, 14 P.3d 713 (2000); State v. Welchel, 115 Wn.2d 708, 722, 801 P.2d 948 (1990); State v. Anderson, 107 Wn.2d 745, 750, 733 P.2d 517 (1987); see also State v. Parris, 98 Wn.2d 140, 151, 654 P.2d 77

(1982). The nine factors are:

 1. Was there an apparent motive for declarant to lie?
 2. What was the declarant's general character?
 3. Did more than one witness hear declarant's statement?
 4. Was the statement made spontaneously?
 5. Did the timing of the statements and the relationship between declarant and witness suggest trustworthiness?
 6. Does the statement contain an express assertion of past facts?
 7. Did the declarant have personal knowledge of the identity and role of the crime's other participants?
 8. Was the declarant's statement based upon faulty recollection?
 9. Was the statement made under circumstances that provide reason to believe the declarant misrepresented defendant's involvement in the crime?

Roberts, 142 Wn.2d at 497-98 (citing McDonald, 138 Wn.2d at 694).

The trial court herein ruled that consideration of each of these nine factors weighed against concluding that the hearsay statements of Ace and Francis were reliable. J.K.T. asserts that the trial court abused its discretion when it concluded that (1) Ace and Francis had a motive to lie because they wanted to dissuade Bauer from testifying, (2) Ace's and Francis's statements were not spontaneous because Ace and Francis visited Bauer expressly to discuss the shooting, (3) the timing of the statements, being three months after the shooting, did not support a finding of credibility, (4) forensic evidence contradicted Ace's and Francis's retelling of the shooting, and (5) reason existed to suspect Ace and Francis were trying to assist J.K.T. and his brothers. We disagree.

First, J.K.T. asserts that Ace and Francis did not have a motive to lie because they told Bauer that her memory of the shooting was accurate. This has nothing to do with Ace's and Francis's motives and does not establish that the trial court erred when it found that Ace and Francis had a motive to lie.

22

Second, J.K.T. asserts that the trial court's finding that the statements were not spontaneous was based on an improper interpretation of controlling law because Ace and Francis were not questioned about the shooting and statements are spontaneous unless made in response to direct questioning. J.K.T. cites to State v. Ryan, 103 Wn.2d 165, 691 P.2d 197 (1984) and Parris, 98 Wn.2d 140, to support his position, but neither of these cases holds that only statements elicited by direct questioning are not spontaneous. Although those cases involved hearsay statements elicited by direct questioning, their results do not dictate that statements not resulting from direct questioning are necessarily spontaneous. See Ryan, 103 Wn.2d at 176; Parris, 98 Wn.2d at 163. J.K.T. does not establish that the trial court's conclusion—that Ace and Francis sought out Bauer to tell her about the shooting, that their statements were planned, and that this indicated that the statements were less reliable—was an abuse of discretion.

Third, J.K.T. asserts that the trial court abused its discretion when it determined that the fact that Ace and Francis only came to discuss the shooting with Bauer three months after it occurred made the statements less reliable. This is a mischaracterization of the trial court's ruling. The trial court explicitly stated that "[t]hree months is not so long a time that memory would be faulty." However, the trial court concluded that the two year gap between Bauer's conversation with Ace and Francis and the time when Bauer would be testifying to their hearsay statements, was long enough to potentially cast doubt on her ability to accurately recall their statements. Thus, the trial court simply did not

conclude that the three-month gap made the statements less reliable and J.K.T. has not established an abuse of discretion.

Fourth, J.K.T. asserts that the evidence does not support the trial court's conclusion that other evidence, particularly forensic evidence, contradicts Ace's and Francis's statements of past fact. Specifically, J.K.T. asserts that the trial court misstated that Ace and Francis told Bauer that Juice shot Bauer and Shinault when Bauer really claimed they told her that Juice shot Bauer and Brooks. Although the trial court did misstate who, according to Bauer, shot whom, the evidence still supports the trial court's conclusion. For example, the forensic evidence conflicted with Ace's and Francis's statements because forensic evidence showed that there were two shooters who used the .45 and .22 caliber firearms possessed by James and his brothers. However, Ace and Francis had told Bauer that there were three shooters and that the brothers were not involved in the shooting. J.K.T. does not establish that the trial court abused its discretion by concluding that forensic evidence conflicted with Ace's and Francis's hearsay statements.

Fifth, J.K.T. asserts that the trial court abused its discretion when it inferred that Ace and Francis may have been trying to assist James and his brothers by creating doubt for Bauer's testimony because they were part of James's community. J.K.T. essentially asserts that such an inference is unreasonable. But, while additional evidence of a closer relationship between Ace, Francis, and James and his brothers would have been stronger supporting evidence for such an inference, it was not unreasonable for the trial court to

24

conclude that Ace and Francis may have sought to assist James and his brothers as members of their community.

J.K.T. does not establish that the trial court abused its discretion when it applied the nine-factor reliability test and determined that Ace's and Francis's hearsay statements were not sufficiently reliable to permit their admission into evidence under ER 804(b)(3).

J.K.T. also attempts to frame this issue as a violation of his right, under the Sixth Amendment to the United States Constitution, to present a defense, which would require de novo review.[20] State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 576 (2010). In so doing, he urges us to disregard binding Supreme Court precedent authorizing the exclusion of evidence under ER 804(b)(3). He contends that the nine-factor test required by our Supreme Court is obsolete and unconstitutional because it is premised on an analysis of the federal confrontation clause that the United States Supreme Court rejected in Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). J.K.T. is wrong.

J.K.T.'s assertion is clearly rebutted by Roberts. See 142 Wn.2d at 496-97. Therein, the defendant sought to present hearsay statements made by others against their penal interests that he asserted were exculpatory, but the statements were excluded by the trial court. Roberts, 142 Wn.2d at 481-83. On

___

[20] The Sixth Amendment guarantees a criminal defendant a meaningful opportunity to present a complete defense, including the right to offer testimony and compel witnesses to testify. State v. Lizarraga, 191 Wn. App. 530, 551-52, 364 P.3d 810 (2015) (citing Holmes v. South Carolina, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)). A defendant, however, does not have the right to offer incompetent, privileged, or otherwise inadmissible evidence. Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988).

review, our Supreme Court noted that the confrontation clause was not at issue because the statements were offered by the defendant. Roberts, 142 Wn.2d at 497. The court explained that this created a presumption in favor of the admissibility of the statements, but did not guarantee they would be admitted. Roberts, 142 Wn.2d at 496. Before being admitted, the court stated, the statements must be determined to be reliable through application of the nine-factor reliability test.[21] Roberts, 142 Wn.2d at 496-98. Thus, it is clear that the nine-factor reliability test remains the law regarding the application of ER 804(b)(3) to statements made against penal interest offered by a defendant— regardless of any changes to the United States Supreme Court's interpretation of the federal constitution's confrontation clause.

The trial court was bound to apply the nine-factor reliability test set forth in numerous Supreme Court decisions. J.K.T. does not cite to any authority supporting his position that he has a constitutional right to present unreliable hearsay evidence. The trial court did not err by applying the nine-factor reliability test, and did not abuse its discretion when it concluded that the hearsay statements were unreliable and, therefore, inadmissible.[22]

---

[21] Indeed, other cases confirm that the reliability requirement was originally imposed to prevent the admission of unreliable exculpatory statements. See Whelchel, 115 Wn.2d at 716 ("The rule itself expressly requires corroboration only of statements *exculpating* the accused. Case law, however has imposed this requirement for *inculpatory* statements as well." (footnote omitted)); State v. Ng, 104 Wn.2d 763, 774, 713 P.2d 63 (1985) ("'[S]tatements . . . tending to exculpate the accused are more suspect and so should have their admissibility conditioned upon some further provision insuring trustworthiness.'" (alterations in original) (quoting FED. R. EVID. 804(b)(3))).

[22] Because we conclude that the trial court's ruling excluding Ace's and Francis's hearsay statements was not erroneous, we need not consider the State's arguments that the exclusion of the statements was, if erroneous, harmless.

IV

Finally, J.K.T. contends that article I, sections 3 and 21 of the Washington Constitution guaranteed him a right to a jury trial and that the trial court denied him this right. This is well-trod ground. The state legislature has mandated that "[c]ases in the juvenile court shall be tried without a jury." RCW 13.04.021(2). Our Supreme Court has consistently held that this statute does not violate a juvenile's constitutional rights. See State v. Weber, 159 Wn.2d 252, 149 P.3d 646 (2006); Monroe v. Soliz, 132 Wn.2d 414, 939 P.2d 205 (1997); State v. Schaaf, 109 Wn.2d 1, 743 P.2d 240 (1987); State v. Lawley, 91 Wn.2d 654, 591 P.2d 772 (1979); Estes v. Hopp, 73 Wn.2d 263, 438 P.2d 205 (1968). We follow this longstanding binding precedent in rejecting J.K.T.'s contention.

Affirmed.

WE CONCUR:

Dwyer, J.

Andrus, J.

27