IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CHANNARY HOR, individually, | ) ) | No. 80835-4-I |
| Appellant/Cross-Respondent, | ) ) ) | DIVISION ONE |
| | ) | PUBLISHED OPINION |
| v. | ) ) | |
| CITY OF SEATTLE, a Washington Municipal Corporation, and OMAR TAMMAM, | ) ) ) ) | |
| Respondent/Cross-Appellant. | ) ) ) ) ) | |

HAZELRIGG, J. — Channary Hor was seriously injured in a vehicle accident involving officers from the Seattle Police Department. Hor filed suit against the driver of the vehicle she was riding in, the City of Seattle, and the individual officers present at the time of the incident. After trial, the jury found the driver solely liable and only awarded damages as to him. One of the key issues at trial was whether the officers were in pursuit of the vehicle, which both officers denied.

Following trial, one of the officers committed suicide and a local news article attributed it to the officer's feelings of remorse over the accuracy of his trial testimony. Based on statements from individuals the officer had spoken with about his testimony, Hor brought a motion for relief from judgment under CR 60(b)(4). The defendants objected and argued the statements Hor sought to admit were

inadmissible hearsay. The trial court agreed, denying the admission of the evidence and the CR 60(b)(4) motion. Hor appeals arguing the evidence was admissible under ER 801(d)(2)(i) or ER 804(b)(3), and that the trial court erred in denying her CR 60(b)(4) motion. We agree that the evidence is admissible, and reverse and remand on that basis, without reaching the CR 60(b)(4) motion.

FACTS

Channary Hor was rendered quadriplegic as the result of a motor vehicle crash after an encounter with Seattle police. Hor filed suit against Omar Tammam, the driver of the vehicle she was in. She also included as defendants the individual Seattle Police Department (SPD) officers involved in the incident and the City of Seattle (the City). Prior to trial, the City and officers filed an unopposed motion to remove the officers from the caption of the case based on the City's vicarious liability, which completely indemnified the officers for any fault that might be attributed to them. Hor did not oppose the motion based on the mutual understanding that the officers remained parties to the case.

One of the fundamental disputes at trial was whether the officers had engaged in a pursuit of the vehicle Hor was riding in, which the City and Officers strenuously denied. Officer Arron Grant was the second officer to respond to the initial contact with Tammam, but the first to depart the scene after Tammam's vehicle. At trial, Grant provided testimony that he was not engaged in a technical pursuit, but Hor attacked his credibility on this matter. There was also expert evidence from both sides on the issue of how the crash occurred. The jury awarded Hor $17.4 million against Tammam and found the City not liable; the

superior court entered a judgment in the City's favor. Hor appealed on multiple grounds and a panel of this court affirmed the judgment in an unpublished opinion.[1]

Grant committed suicide in April 2017. In May of 2017, an article was published by the Tacoma News Tribune entitled "Suicidal Lakewood police officer brooded over his testimony in lawsuit, colleagues say." Hor learned of Grant's allegedly inconsistent testimony from the news article. Through counsel, Hor contacted officers to whom Grant had spoken about his trial testimony and obtained their declarations. The statements in question are as follows:

1. Declaration of Anders Estes (former Lakewood Police Sergeant):

I recall Officer Grant shared with me the following: He basically told me that he had responded to help another officer. At some point during that call, a car ended up leaving the scene. He went in pursuit of that car. He definitely used the word "pursuit" in the technical sense of the word. He chased the car. The car ended up wrecking. Because of that wreck, there was a large civil suit against the City of Seattle. He said that when he got subpoenaed, he had to go talk to two attorneys who worked for the City of Seattle. Those attorneys asked him a lot of questions about the pursuit. One question he had trouble with was when he turned his lights on. He told me how long ago it was and that he did not remember. He said the attorneys really pressed him about when he turned his lights on. He could not tell them. They kept giving him different reference points. They finally said: "Let's go out there." They loaded him in a car and took him out to the scene. Once they were at the scene, they pointed at different places and said: Did you turn your lights on here or here? He said he did not remember. He could not remember. Finally, they gave him a reference point and instructed him you need to say you turned your lights on here. He told me he was uncomfortable with that. He came back to the department and spoke to people about it in the department. He said there were a number of people who said they had faced the same situation with prosecutors or attorneys. He said these people he talked to told him to just tell the truth, if he didn't remember he didn't remember. But, he said he really felt like he was under pressure. So when it finally came time to testify, he went up and testified to what the attorneys told him to testify to, which he

---

[1] Hor v. City of Seattle, No. 70761-2-I (Wash. Ct. App. Aug. 3, 2015) (unpublished), http://www.courts.wa.gov/opinions/pdf/707612.pdf.

knew was not the truth. Once he had done that, he said that he felt bad. He said he felt he had betrayed the badge or something like that. So he went to the then Chief Farrar and Assistant Chief Zaro and told them what he had done. He said they told him "Don't worry about it."

2. The Declaration of Michael Wulff (Lakewood Police Officer):

In discussing the event that took place while he was an SPD officer, Officer Grant told me that he was a secondary car involved in an injury incident. Officer Grant told me that he and another officer had contacted a vehicle in a park. He told me that the vehicle had fled and was followed by another officer. Officer Grant stated that the attorneys for the City of Seattle told him to testify that he and the other officer involved were not pursuing any vehicle and were not in pursuit; that no Seattle officers were in pursuit of the fleeing vehicle when it crashed; and that Officer Grant did not have his emergency lights activated.

He stated the event happened a long time ago and that he couldn't remember many details. He did not remember details about where or when his lights were activated. He could remember certain details about the initial car stop, the car fleeing, going after the fleeing car and following it, and seeing it wrecked around a corner. Officer Grant also stated that he felt pressured by the attorneys for the City to testify to observations or details that would assist the City's case, but that he couldn't because he didn't remember or was not even present for some [sic] them. It was apparent from his actions and tone during this conversation that he was nervous and not looking forward to his testimony.

3. Testimony from a deposition of Michael Zaro (Lakewood Police Chief) taken for Shadow v. Lakewood:[2]

[examination by defense counsel]
Q[:] Did Arron Grant come to you and say that he had given false testimony in a case where he was asked to testify?
A[:] That he believed so, yes.
Q[:] Okay. And he believed he was dishonest because he told—or strike that. What did Arron Grant believe he was—his testimony was dishonest?
A[:] About?
Q[:] Yeah. Yeah, why did he think he had been dishonest?
[Plaintiff's Counsel]: Object to the form of the question, but you can answer it if you know.

_____

[2] Pierce County Superior Court No. 16-2-08405-8.

[Zaro]: The way he portrayed it to me was that he was in a deposition or a discussion with attorneys representing Seattle, and one of the points—one of the questions was where he turned his lights off in a pursuit, related to a civil suit that was going on. And he said it was in one location. They said, [c]ould it have been here? And they went back and forth and he finally agreed that it could have been here and testified to that but still believed it could have been—or still believed it was here, but he said it could have been in this other location.
[Defense Counsel]:
Q[:] So how did you guide him with regard to his concerns about dishonesty in that instance?
A[:] I told him that—well, Chief Farrar and I both told him that was—that, you know, he got browbeat by a civil attorney into agreeing that, you know, something, could have happened here, that's not uncommon, and that it wasn't for him to worry about to the extent that he was worrying.

Hor retained new counsel after gathering this information. Counsel sought permission from the appellate court before seeking relief from judgment in the superior court. In superior court, Hor filed a motion for an order to show cause why relief from judgment should not be granted based on misconduct of a party under CR 60(b)(4) and (11). The court granted Hor's motion and set a show cause hearing. The trial court also granted a stipulated order to substitute Grant's estate as party to the case.

The City and Adam Thorp, the other SPD officer involved, objected to the proffered evidence of Grant's post-trial statements, arguing that relief from judgment should not be granted. The administrator of Grant's estate joined the response from the City and Thorp. Hor responded by arguing that Grant's statements were non-hearsay as statements by a party opponent under ER 801(d)(2)(i). Hor argued in the alternative that the statements were an exception to hearsay exclusion under ER 804(b)(3) as statements against both Grant's pecuniary and penal interests. Following oral argument at the show cause hearing,

- 5 -

the trial court ruled the statements were inadmissible under either of Hor's proffered theories. This evidentiary issue was dispositive and the court denied the motion for relief from judgment. The court also denied Hor's request for further discovery. Hor now appeals to this court, after denial of her petition for direct review by the Supreme Court.

ANALYSIS

I.    Admissibility of Grant's Post-Trial Statements

Hor first argues that the court erred in excluding statements Grant purportedly made to others prior to his death about his alleged perjury in the trial. At the trial court, Hor asserted that the statements were admissible as non-hearsay under ER 801(d)(2)(i) as a statement of party opponent, or in the alternative as an exception to hearsay under ER 804(b)(3), statement against interest.

This court reviews interpretation of an evidence rule de novo. Diaz v. State, 175 Wn.2d 457, 462, 285 P.3d 873 (2012). Once a reviewing court has determined that the trial court properly interpreted an evidence rule, the standard of review shifts for the question of how the rule was applied. "Admissibility of evidence is within the broad discretion of the trial court and will not be reversed on appeal absent a showing of manifest abuse of discretion." In re Parentage of J.H., 112 Wn. App. 486, 495, 49 P.3d 154 (2002). "Discretion is abused if it is based on untenable grounds or for untenable reasons." Id. ER 102 states:

> These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined.

While ER 102 does not directly address the hearsay questions before us, this rule serves as a guiding principle for our review of evidentiary rulings. See State v. Butler, 53 Wn. App. 214, 223, 766 P.2d 505 (1989); See also Bengtsson v. Sunnyworld Int'l, Inc., 14 Wn. App. 2d 91, 106 n.8, 469 P.3d 339 (2020).

    A. Statement by Party Opponent

ER 801(d)(2)(i) states in relevant parts: "(d) Statements Which Are Not Hearsay. A statement is not hearsay if . . . . (2) Admission by Party-Opponent. The statement is offered against a party and is (i) the party's own statement, in either an individual or a representative capacity." Washington case law on ER 801(d)(2)(i) under the particular posture presented here is not extensively developed.

The issue before us is whether, since his death, Grant's statements still constitute those of a party-opponent for purposes of ER 801(d). Hor first argues that the statement is admissible based on numerous cases decided prior to Washington's adoption of the Federal Rules of Evidence in 1979. See Plath v. Mullins, 87 Wn. 403, 151 P. 811 (1915); Loundry v. Lillie, 149 Wn. 316, 270 P. 1029 (1928). These cases do not guide our inquiry as they focus on common law evidentiary rules which no longer represent our starting point since the adoption of formal evidentiary rules. Further, federal courts are split on this issue and neither party offers compelling argument as to why we should follow one side of that split

over the other.[3]   We are, however, properly guided in our analysis by state precedent.

There are two Washington cases identified by the parties as helping to illuminate the issue.  Erickson v. Robert F. Keer, M.D., P.S., Inc. involved a medical malpractice action brought by the son, husband, and estate of a patient who had committed suicide.  125 Wn.2d 183, 185, 883 P.2d 313 (1994).  The defendant doctors sought to introduce statements by the deceased to a friend that her husband was abusive, tight with money, and should be the prime suspect if anything happened to her.  Id. at 192.  The trial court originally admitted the statements, this court reversed, and the Supreme Court affirmed the Court of Appeals.  Id.  The Supreme Court stated, "Mrs. Erickson's statements were not an admission of a party-opponent as to the wrongful death action brought by Andrew and Craig Erickson in their individual capacities."[4]  Id.  However, the court then "decline[d] to rule on the estate's cause of action because no objection was made or preserved on its behalf."  Id. at 192.

This court's opinion in the first phase of the appeal process provided similar language, "Mrs. Erickson's statements to Delaurenti are not admissions against the interest of the claim for damages recoverable by her estate, and thus are not admissible under ER 801(d)(2)."  Erickson v. Robert F. Kerr, M.D., P.S., Inc., 69 Wn. App. 891, 902, 851 P.2d 703 (1993), reversed on other grounds, 125 Wn.2d 183.  In Erickson, the testimony was being offered to prove damages, which

---

[3] See Huff v. White Motor Corp., 609 F.2d 286 (7th Cir. 1979); Estate of Shafer v. C.I.R., 749 F.2d 1216 (6th Cir. 1984); In re Cornfield, 365 F. Supp.2d 271 (E.D. N.Y. 2004).
[4] The decedent's husband and son, respectively.

distinguishes it from the facts of the case before us. Erickson's statements would have been used by the defense for mitigation as to an award for damages in favor of the husband by attempting to prove the marriage was less than ideal and could have thereby justified a smaller award. In Erickson, the court acknowledged the decedent's testimony was not going to have bearing against the estate, since it went to the calculation of damages for the husband as to quality of the marriage. Id. at 903.

The parties also separately address In re Estate of Miller, 134 Wn. App. 885, 143 P.3d 315 (2006). Miller involved an estate dispute as to whether payments made to the deceased were loans or a gift. Id. at 888-89. Division Three's analysis of the statements made by the deceased includes a direct quote from the Washington Practice series on evidence which states: "'The death of a party-opponent does not affect the admissibility of that party's admissions under Rule 801, but under some circumstances the admissions may be barred by the dead man statute.'" Id. at 895 (quoting 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 801.34, at 336 (4th ed. 1999)). The court then held that "[t]he deceased is a party to this lawsuit and his admissions are not inadmissible hearsay pursuant to ER 801(d)(2)." Id.

In the case before us, the trial court was disinclined to rely on Miller because, as the City pointed out in its argument, that opinion primarily quotes the 4th edition of the Washington Practice Series on Evidence from 1999. Subsequent updates abandon the analysis adopted in Miller, instead stating:

> Prior to the adoption of the Federal Rules of Evidence and their state counterparts, a statement by a person in privity with a party <u>was</u> considered an admission by party-opponent, and such statements were often admissible on that theory. The drafters of the current rules, however, deliberately chose to change the law in this regard, and statements by persons in privity with a party are no longer admissible as admissions by a party-opponent.

§ 801.51, Admissions by persons in privity with party, 5B WASH. PRAC., EVIDENCE LAW AND PRACTICE § 801.51 (6th ed. 2018).  While much of the parties' briefing on appeal centers on this shift between versions of the practice series, this argument misses the mark.  <u>Miller</u> is a published opinion and as such it is elevated above secondary sources in the established hierarchy of legal authority.  <u>Miller</u> has not been overruled, thus, for purposes of ER 801(d)(2), the death of a party-opponent does not bar the admissibility of their statements as non-hearsay under the evidentiary rule.

<u>Miller</u> is binding case law in our state.  "[T]rial courts are bound by published decisions of the Court of Appeals."  <u>In re Marriage of Snider and Stroud</u>, 6 Wn. App. 2d 310, 315, 430 P.3d 726 (2018); RCW 2.06.040.  Here, though the trial court was presented with two alternatives, each discussed above, it is clear that <u>Miller</u> controls.  Based on this misapplication of the law, the trial court abused its discretion by ruling that the declarations provided by Hor were inadmissible as statements of a party opponent.

## B.  Statement Against Interest

Hor next argues in the alternative that the trial court erred in failing to admit Grant's statements under the hearsay exception of ER 804(b)(3) which provides:

(3) <u>Statement Against Interest</u>. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. In a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Hor avers, as she did in the trial court, that Grant's statements to others were such that they subjected him to criminal and civil liability, and potentially impacted his pecuniary interest, and are therefore properly admissible as an exception to the hearsay rule.

The parties and the trial court appeared to focus on criminal or civil liability at the show cause hearing and, with regard to civil liability, specifically the issue of Grant's indemnification by the City. The trial judge applied the rule and determined that the statements did not rise to a level that would subject Grant to either civil or penal liability, nor impact a pecuniary interest. The court held that Grant likely would not have reasonably believed that such a risk existed at the time he made them, stating,

I don't think they're so far against any pecuniary interest, because Mr. Grant really did not have a pecuniary interest in the outcome of his case or in the statements that he made. I could not say that a person in Officer Grant's position would not have made the statements unless he believed them to be true.

The City expressly admitted that Grant was operating in his official capacity as a Seattle Police Officer when the car accident occurred and cited Seattle Municipal Code Chapter 4.64 as the source and scope of his indemnification. The court

appears to have found this argument persuasive in its consideration of whether the statements could be admissible as an exception based on implicating Grant's civil liability. This is a reasonable outcome by the trial court as to civil liability from the suit brought by Hor, based on indemnification by the City. However, this ignores the clear, and separate, pecuniary interest a law enforcement officer has in not having their credibility called into question such that impeachment evidence is available to be used against them in future cases.

If Grant was found by the trial court to have made inconsistent statements under oath, any cases in which he was involved as an arresting or investigating officer could be jeopardized and any prosecuting authority utilizing him as a witness in future cases may be obligated to disclose such information to opposing counsel. It is perhaps axiomatic that one of the key functions of a law enforcement officer is to provide testimony in their official capacity. When testifying under oath, officers, like other witnesses, are subject to impeachment. See ER 608.

Brady v. Maryland makes clear the obligation of a prosecutor to disclose favorable evidence in their possession to the defense. 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); See also CrR 4.7. Favorable evidence in this context includes impeachment evidence, as well as potentially exculpatory evidence. State v. Davila, 184 Wn.2d 55, 70, 357 P.3d 636 (2015). If an officer is found to have possible impeachment evidence associated with them, such that notification must be issued to defense under Brady, this could have tangible consequences as

to the officer's pecuniary interests.[5] A determination that one is a "Brady" officer impacts promotions, lateral transfers or change of agencies, and can even result in termination if the underlying impeachment information is sufficiently serious or damaging.

At the time Grant made these statements to other officers, they were against his pecuniary interest in that they could have subjected him to greater scrutiny of his credibility in future cases, impacting his ability to effectively carry out that essential function of a police officer to credibly testify. Any such findings by the trial court, which could be made during the CR 60 motion (or if perjury charges were later brought), would then obligate the State to provide this information to defense under Brady in any criminal prosecutions in which he was professionally involved as a law enforcement officer. Such a determination can be sufficiently stigmatizing as to have immediate and long lasting professional impact. If Grant's purported post-trial statements are to be believed, Estes' declaration indicating that Grant had characterized his conduct as having "betrayed the badge or something like that" would demonstrate his awareness of the specific implications of inconsistent testimony or perjury for a police officer. We find that the trial court abused its discretion in failing to recognize this clear pecuniary interest for a witness employed as a law enforcement officer. Given our conclusion that the statements were against Grant's pecuniary interest, we need not also determine

---

[5] Criminal law practitioners often refer to such officers as "Brady" officers or officers "on the Brady list" based on a known need to disclose potential impeachment information and the implications that can have on criminal prosecutions.

whether the statements subjected him penal or civil liability as any of these bases may result in admission as a hearsay exception under ER 804(b)(4).

Once a determination is made that a statement is against one's interest, then the trial court must determine the reliability of the statement. "Our Supreme Court long ago established that to determine whether a hearsay statement against interest satisfies the requirement of trustworthiness, courts should assess a statement's reliability using a nine-factor reliability test." State v. J.K.T., 11 Wn. App. 2d 544, 566, 455 P.3d 173 (2019). The nine-factors are:

> 1. Was there an apparent motive for declarant to lie?
> 2. What was the declarant's general character?
> 3. Did more than one witness hear declarant's statement?
> 4. Was the statement made spontaneously?
> 5. Did the timing of the statements and the relationship between declarant and witness suggest trustworthiness?
> 6. Does the statement contain an express assertion of past facts?
> 7. Did the declarant have personal knowledge of the identity and role of the crime's other participants?
> 8. Was the declarant's statement based upon faulty recollection?
> 9. Was the statement made under circumstances that provide reason to believe the declarant misrepresented defendant's involvement in the crime?

Id. (citing State v. Roberts, 142 Wn.2d 471, 497-98, 14 P.3d 713 (2000)).

As the court did not find that the statements were such that they subjected Grant to criminal liability or went against his pecuniary interest, it did not reach the nine factors. The court noted that Grant had acknowledged his lack of memory and, thereby, the reliability of his statements. Additionally, the record supports that he had provided inconsistent statements such that the credibility of his memory as

to a pursuit were already comprehensively raised at trial. This secondary analysis is necessary to determine if reliability is sufficient to admit Grant's statements into evidence. The trial court is in the best position to weigh such factors in the full context of all of the evidence presented.

## II. Relief from Judgment

"On appeal, a trial court's disposition of a motion to vacate will not be disturbed unless it clearly appears that it abused its discretion." Lindgren v. Lindgren, 58 Wn. App. 588, 595, 794 P.2d 526 (1990). "Abuse of discretion means that the trial court exercised its discretion on untenable grounds or for untenable reasons, or that the discretionary act was manifestly unreasonable." Id. We are unpersuaded by Hor's argument on appeal that this court should apply a less deferential standard of review because the judge who ruled on the CR 60(b)(4) motion was not the same judge who heard the trial. Neither are we moved by the assertion of the parties at oral argument that this court could, or should, rule on the merits of the CR 60(b)(4) motion.

Under CR 60(b)(4), a trial court may vacate a judgment entered which was procured by fraud, misrepresentation, or misconduct. "The rule is aimed at judgments unfairly obtained, not factually incorrect judgments." Sutey v. T26 Corporation, 13 Wn. App. 2d 737, 756, 466 P.3d 1096 (2020). "[T]he fraudulent conduct or misrepresentation must cause the entry of the judgment such that the losing party was prevented from fully and fairly presenting its care or defense." Lindgren, 58 Wn. App. at 596 (emphasis omitted). The party attacking the judgment under CR 60(b)(4) "must establish the fraud, misrepresentation, or other

misconduct by clear and convincing evidence." Id. Further, perjury alone does not necessarily rise to the level of fraud to warrant a vacation of judgment. Doss v. Schuller, 47 Wn.2d 520, 526, 288 P.2d 475 (1955). Even then, the perjury must be of "controlling importance" as to the determination of liability. Id.

The court here denied the motion for relief from judgment based on the fact that, absent Grant's excluded post-trial statements, Hor had no evidence to meet the standard for a CR 60 motion. In light of our reversal of the trial court's ruling on the admissibility of those statements, however, the parties will have an opportunity to further litigate this issue and the court will consider the CR 60 standards anew. It may, at its discretion, order further discovery to provide a more comprehensive record upon which to base its ruling. While we have offered guidance with regard to admissibility of Grant's purported statements, the trial court is best situated to consider the impact they might have had on a jury and the final judgments entered in this case.

We reverse and remand for proceedings consistent with this opinion.

WE CONCUR:

Andrus, A.C.J.                    Mann, C.J.

- 16 -