FILED
4/4/2022
Court of Appeals
Division I
State of Washington

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

RONALD JAY BIANCHI,

Appellant.

No. 83338-3

DIVISION ONE

UNPUBLISHED OPINION

APPELWICK, J. — Bianchi argues the charges on which he was convicted were barred by the statute of limitations. He argues that he was denied his right to present a defense, that his counsel was ineffective, and that the prosecutor engaged in misconduct at closing argument. Bianchi claims the charges of malicious explosion were defective, the related jury instructions were defective, and the evidence was insufficient. He argues his multiple convictions of possession of stolen property violate double jeopardy. And, he argues that cumulative error requires reversal. Affirmed in part, reversed in part, and remanded to correct the sentence.

## FACTS

On October 17, 1997, Ronald Bianchi, Michael Brock, and Aaron Ahern robbed Seafirst Bank in Vancouver, Washington. Before the bank robbery, Bianchi stole three cars: a Mustang, a LeBaron, and a Camaro. He parked these cars at different locations throughout the area. In preparation for the robbery, Bianchi and

Ahern made pipe bombs. He and Ahern stole firearms, ammunition, and a grenade.

Before the robbery, the men placed a bomb behind a Kmart store, to draw attention away from the bank. When the bomb exploded, a truck driver was behind the Kmart store completing a delivery at Kmart's loading dock, but he was not injured.

When the three men entered the bank, one of them held a gun to an employee's head. The men stole money from the bank. Bianchi drove the getaway car, the LeBaron. They drove the LeBaron to the Mustang, and got into that car. In the Mustang, they noticed police following them.

Sergeant Craig Hogman, from the Clark County Sheriff's Office, was on traffic patrol at the time, driving in an unmarked police car. He heard radio broadcasts about the explosion and the bank robbery. Sergeant Hogman was in the area of the bank and noticed a Mustang with three people in it, and he started to follow the car to see if they were the suspects. When the Mustang accelerated, Sergeant Hogman turned his lights and siren on. Someone in the Mustang hung out the passenger door window to fire at him with a high powered rifle. He stated the rear window of the Mustang disintegrated, and someone fired out of the back window of the car. He testified, "[M]y assumption was that they had shot out the rear window so that they would have a clear line of sight for shooting at me." Rounds of "constant" gunfire struck his patrol car.

At one point, the Mustang was stopped in the middle of the road, and the shooters in the Mustang "opened fire." Sergeant Hogman says he "took on the

2

most rounds in [his] patrol car." Sergeant Hogman ducked under his dashboard, "trying to move around in attempt not to get hit." He felt "bits of material that [were] like little bits of shrapnel that [were] exploding inside the car." His "radar unit that [was] directly in front of [him] in the patrol car explode[d]." His "driver's window exploded," and the "entire car interior [wa]s exploding at that point." After the shooting stopped and the Mustang drove away, Sergeant Hogman continued to pursue the Mustang at a distance until he lost sight of it.

Officer Lawrence Zapata and Officer Adam Millard, from the Vancouver Police Department, heard from dispatch that Sergeant Hogman needed help. They located the suspects' car, and heard a gunshot coming from the direction of that vehicle. The officers followed the car, and Officer Zapata could see someone firing a rifle out the back of the car, and another person firing a shotgun out of the passenger side window. Officer Zapata testified that he heard both weapons firing, and counted "five or six" shots. Officer Zapata fired a single shot. After this, "rounds [were] still being shot at us," and he saw muzzle flashes.

Eventually, the Mustang hit a tree. Bianchi, Ahern, and Brock ran from the car into a nearby ravine. After the car crashed, Bianchi took off running, while Brock and Ahern fired at the officers. Officer Zapata trained his shotgun on Bianchi, but watched Bianchi run into the ravine out of his sight. Officer Zapata testified that he heard gunfire coming from the ravine, and saw one of Bianchi's accomplices with a shotgun. The officers returned fire, and at some point, the two suspects firing from the ravine were no longer moving. Bianchi fled the ravine and attempted to hide, but he was eventually apprehended by a police officer.

3

On October 23, 1997, the State charged Bianchi with first degree robbery, three counts of attempted first degree felony murder, and second degree malicious explosion. A second amended information added two additional counts of first degree robbery, two counts of second degree assault, attempt to elude, and three counts of first degree possession of stolen property. Bianchi pleaded guilty to all counts. In exchange for Bianchi's guilty plea, the State dropped charges against his girlfriend, who was charged with multiple felonies related to being an accomplice in all the crimes Bianchi pleaded guilty to in 1998. Bianchi was sentenced to 72 years in prison. .

In 2008, the Washington Supreme Court held that attempted felony murder was no longer a crime. In re Personal Restraint of Richey, 162 Wn.2d 865, 870, 175 P.3d 585 (2008). Following that decision, Bianchi brought a personal restraint petition challenging the validity of his convictions for that offense. In re Pers. Restraint of Bianchi, No. 49296-2-II, slip op. at 1, 4 (Wash. Ct. App. Feb. 22, 2017) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2049296-2-II%20 Unpublished%20Opinion.pdf. The Court of Appeals vacated his three counts for attempted first degree felony murder. Id. at 1, 4. On remand, the trial court granted Bianchi's motion to withdraw his guilty plea for the rest of his counts.

The State filed a fourth amended information on September 1, 2017, charging Bianchi with three counts of attempted first degree murder against the three officers. It also charged him with three counts of robbery in the first degree, two counts of assault in the second degree, attempting to elude a pursuing police vehicle, three counts of possession of stolen property, and malicious explosion in

4

the second degree. A fifth amended information added three charges of attempted murder in the second degree.[1]

The case first went to trial in January 2019. The jury found Bianchi guilty of most charges, including attempted murder in the first degree of Sergeant Hogman. The court declared a mistrial on the charges related to attempted first and second degree murder of Officers Zapata and Millard.

The State retried Bianchi on the attempted murder charges, with trial beginning in September 2019. The jury found Bianchi guilty of both attempted first and second degree murder of Officers Zapata and Millard at the second trial. Bianchi was sentenced to 1,131 months, or over 94 years, in prison.

Bianchi appeals.

## DISCUSSION

I.  New Charges

A.  Collateral Estoppel

Bianchi argues that the 2017 charges for first degree and second degree attempted murder were barred by the statute of limitations. The State counters that Bianchi previously made this argument to the court, so collateral estoppel bars reviewing the issue again. Bianchi responds that collateral estoppel does not apply because the prior decision did not include any discussion of whether the statute of limitations had run for particular crimes.

---

[1] The State also filed sixth and seventh amended charges before the first trial ended. The sixth amended information removed the charge for attempting to elude a pursuing police vehicle. The seventh amended information removed one charge of assault in the second degree.

"The doctrine of collateral estoppel applies in criminal cases and bars relitigation of issues actually adjudicated." State v. Collicott, 118 Wn.2d 649, 660, 827 P.2d 263 (1992). When applying collateral estoppel, the court must determine which issues were raised and resolved by the former judgment and if those issues are identical. Id. In response to Bianchi's prior personal restraint petition, we held, "[O]n remand, the State will be able to file any charges for which the statute of limitation has not run." Bianchi, No. 49296-2-II at 3. Bianchi did not determine whether any specific charges could be filed. It merely warned that a new filing was a possibility for charges not barred by the statute of limitations. Because the issue of whether the statute of limitations on the murder charges had run was not raised and resolved in the prior case, collateral estoppel does not apply.

B. Statute of Limitation

1. Tolling of the Statute

At the time of Bianchi's crime in 1997, the statute of limitations for attempted murder was three years. Former RCW 9A.04.080(1)(h) (1997). The fourth amended information charging Bianchi with attempted murder was filed in 2017, twenty years after Bianchi's crime. The State argues that the charges were properly filed, as the statute of limitations was tolled when the original information was filed, in 1997. Bianchi argues that the tolling provision does not apply and that the new attempted murder charges against him are barred by the statute of limitations.

Washington state law sets guidelines for time periods in which the State can bring criminal charges against a defendant after the commission of a crime. See

RCW 9A.04.080. RCW 9A.04.080(4) provides a tolling provision to extend the statute of limitations:

> if, before the end of a period of limitation prescribed in subsection (1) of this section, an indictment has been found or a complaint or an information has been filed, and the indictment, complaint, or information is set aside, then the period of limitation is extended by a period equal to the length of time from the finding or filing to the setting aside.

Statutes of limitation in criminal cases are measures of public policy. State v. Hodgson, 108 Wn.2d 662, 667, 740 P.2d 848 (1987). They can be changed or repealed in any case where the right of dismissal has not been "absolutely acquired by the completion of the running of the statutory period of limitation." Id. Therefore, when a statute extends a period of limitation, or allows for tolling, the prosecution can commence at any time within the newly established limitation period, even if the original period had expired. Id. at 668.

"[S]tatutes of limitation usually do not bar recharging a defendant whose conviction has been reversed due to a defective charging document." City of Auburn v. Brooke, 119 Wn.2d 623, 639, 836 P.2d 212 (1992). When recharging someone due to a defective charging document, the prosecution is not barred from including a new charge, as long as both charges are for the same offense. In re Pers. Restraint of Thompson, 141 Wn.2d 712, 728-29, 10 P.3d 380 (2000). "[I]n the statute of limitation, an 'offense' is an act or conduct and not the statutory definition of an offense through the enumeration of its elements." Id. at 728.

In considering if the charges are for the same offense, courts determine whether the new charges broaden or substantially amend the original charges by

7

examining whether the charges rest on the same factual allegations. See id. at 729. Courts also review if the new charges require preparation of new evidence or defenses on the part of the defendant. Id.

In Thompson,[2] the accused was charged with first degree rape of a child even though that charge did not exist at the time he committed the offense. Id. at 719. To determine whether the State could recharge Thompson with the similar charge of first degree statutory rape, the court reviewed the factual allegations by examining how Thompson himself described his offense. Id. at 729. The court held that the facts at hand supported elements of both the old and new statute. Id. Following Thompson, we review Bianchi's new charges to determine whether the new attempted murder charges rest on the same factual allegations, and if he needed to present new evidence or defenses.

### 2. Amended Charges

The State originally charged Bianchi with attempted felony murder on October 23, 1997. This charge included,

> That he, Ronald Jay Bianchi did, together with two others, commit the crime of Robbery in the First Degree as charged in Count I, and in furtherance of such crime or immediate flight therefrom the defendant or other participants did attempt to cause the death of a person other than one of the participants.

---

[2] Bianchi argues that his case is similar to Thompson, and that the statute of limitation had run in that case. 141 Wn.2d at 729. However, Bianchi misinterprets this case. Thompson holds that the statute of limitation did not run, but had tolled. Id. at 729-30.

The three original charges for attempted felony murder included one charge for each officer: Officers Zapata and Millard and Sergeant Hogman. Bianchi pleaded guilty to these charges.

In the new charges filed in 2017, the State added three counts of attempted first degree murder, and three counts of attempted second degree murder. The listed elements for attempted first degree murder included: (1) a premeditated attempt to cause the death of each of the three officers, (2) an act which was a substantial step toward that crime, and/or (3) was an accomplice to that crime. The elements for attempted second degree murder included that Bianchi or his accomplices intended to cause the death of each of the three officers, and took a substantial step to do so, and/or was an accomplice of that crime. The new charges contained the additional elements of premeditation for attempted first degree murder and intent to kill for attempted second degree murder.

Bianchi argues that adding these elements substantially amended the charges, as proving these mental states required him to prepare new evidence and defenses. According to Bianchi, he needed to present new evidence that his accomplices had intended to shoot only the police cars and not the officers themselves in order to rebut the claims of premeditation and intent. Bianchi cites to Thompson, 141 Wn.2d at 729 in support of this theory. Thompson states that the charge in question was not broadened or substantially amended "because it rests on the same factual allegations and requires no preparation of new evidence or defenses." Thompson, 141 Wn.2d at 729. Bianchi speculates that he had to

9

prepare new defenses than he would have presented if his case had gone to trial in 1997.

However, the activities Bianchi would have needed to defend against for attempted felony murder in 1997 were the same activities he defended at his 2019 trials. The facts relied on for the attempted murder charges were the same facts relied on for the attempted felony murder charges. In 1998, Bianchi pleaded guilty to attempting to cause the death of Sergeant Hogman, Officer Zapata, and Officer Millard. At his 2019 trials, a recording of Bianchi's 1997 interview with a detective was played at both trials. In this recording, Bianchi narrated the steps he and his accomplices took in preparing for the robbery, starting up to two weeks before it occurred. He admitted that he robbed the bank. He described switching cars from the LeBaron to the Mustang, and stated that he drove the Mustang while Brock and Ahern fired at police. He said that Ahern threw the grenade at police officers. The new charges do not call for Bianchi to answer for any activities he would not have been required to defend but for his guilty plea.

Because the new charges substantially related to the original charges filed in 1997, the statute of limitation was tolled. Bianchi was properly charged in 2017 for attempted first degree and second degree attempted murder.

### 3. "Set Aside" Equates With "Vacated"

Bianchi argues in a statement of additional grounds (SAG) that the legislative intent of RCW 9A.04.080(4) extends the statute of limitation only when a case is set aside, not when a conviction is vacated. Bianchi's three counts for attempted felony murder were vacated. Bianchi, No. 49296-2-II at 1, 4. He argues

10

that because this court vacated his plea and did not set aside the charging information in the case, the statute of limitation was not extended.

RCW 9A.04.080(4) states,

If, before the end of a period of limitation prescribed in subsection (1) of this section, an indictment has been found or a complaint or an information has been filed, and the indictment, complaint, or information is set aside, then the period of limitation is extended by a period equal to the length of time from the finding or filing to the setting aside.

Bianchi argues without citation to authority that there is a substantial difference between the language "set aside" and "vacate." There is no merit in this argument.

II. Right to Present a Defense

Bianchi argues that the trial court violated his constitutional right to present a defense at the second trial. He contends that the court did not allow testimony that the plan was to shoot at the police vehicles to disable them, rather than kill the officers. The State responds that the statements were properly excluded under the rules of hearsay, and that even with the exclusion, Bianchi was still able to argue his theory of the case.

"We review an alleged denial of the constitutional right to present a defense de novo." State v. Lizarraga, 191 Wn. App. 530, 551, 364 P.3d 810 (2015). The accused has a "right to a fair opportunity to defend against the State's accusations" under due process. Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). However, the defendant's right to present testimony is not absolute. Lizarraga, 191 Wn. App at 553. "The defendant's right to present a

11

defense is subject to 'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" Id. (quoting Chambers, 410 U.S. at 302). Generally, a constitutional right to present a defense is not violated if a state or federal rule operates to exclude evidence. See State v. Strizheus, 163 Wn. App. 820, 833, 262 P.3d 100 (2011). But, an evidentiary rule violates the right to present a defense if the rule is arbitrary or disproportionate and infringes on a weighty interest of the accused. State v. Rafay, 168 Wn. App. 734, 796, 285 P.3d 83 (2012). "The Supreme Court has generally found such an abridgment only when the evidentiary ruling effectively prohibited the substantive testimony of the defendant on matters relevant to the defense or the testimony of a percipient witness." Id.

During the first trial, Shilley Walker, Brock's girlfriend, testified that she and Brock had discussed what he would do if he was followed after a bank robbery. She stated that he told her that "he would shoot at the engine to try to make the car stop following them."

Before the second trial, Walker did not respond to her subpoena to testify. Bianchi sought to play the recording of Walker's previous testimony. The State argued that the contents of Walker's testimony were inadmissible as hearsay because of the statement by Brock. The trial court ruled that the statement was problematic and excluded the evidence. With this evidence excluded at the second trial, Bianchi could argue during closing argument that Bianchi's accomplices had an intent to disable the police vehicles and not murder the officers.

12

Bianchi alleges that Walker's testimony is admissible as a statement against interest, a hearsay exception under ER 804(b)(3).[3] The State argues that the evidence does not qualify as a statement against interest because it is self-serving.

We review whether hearsay is a statement against interest under ER 804(b)(3) for abuse of discretion. State v. J.K.T., 11 Wn. App. 2d 544, 566, 455 P.3d 173 (2019). "Hearsay" is statement made out of court offered as evidence to prove the truth of the matter asserted. ER 801(c); State v. Bass, 18 Wn. App. 2d 760, 794, 491 P.3d 988 (2021), review denied, 198 Wn.2d 1034, 501 P.3d 148 (2022). Hearsay is not admissible unless an exception applies. ER 802. One exception allows admission of a statement against interest if the declarant is unavailable to testify. ER 804(b)(3). A statement against interest is a statement that a reasonable person in the declarant's position would have made only if the person believed it to be true, would expose the declarant to criminal liability, and is supported by corroborating circumstances that indicate its trustworthiness. ER 804(b)(3).

To determine both the reliability of Brock's statement, and if it was a statement against interest, the trial court considered the "Ryan factors."[4] See State v. Ryan, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984). Those factors include,

---

[3] Bianchi also argues that there is a presumption for admissibility, allowing evidence in under ER 804(b)(3) because of the constitutional right to present a defense. To bolster this argument, Bianchi cites to State v. Roberts, 142 Wn.2d 471, 497, 14 P.3d 713 (2000). However, Roberts states, "Because the offered portions were against Cronin's interest and offered by the defense, the presumption is admissibility and not exclusion." Id. Bianchi misrepresents this rule.

[4] This refers to State v. Ryan, 103 Wn.2d 165, 175, 691 P.2d 197 (1984).

> '(1) whether there is an apparent motive to lie; (2) the general character of the declarant; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; and (5) the timing of the declaration and the relationship between the declarant and the witness'[; (6)] the statement contains no express assertion about past fact, [(7)] cross-examination could not show the declarant's lack of knowledge, [(8)] the possibility of the declarant's faulty recollection is remote, and [(9)] the circumstances surrounding the statement (in that case spontaneous and against interest) are such that there is no reason to suppose the declarant misrepresented defendant's involvement.

Id. (quoting State v. Parris, 98 Wn.2d 140, 146, 654 P.2d 77 (1982)). These factors are used to determine trustworthiness and reliability of the speaker and statements. Id. at 175; Parris, 98 Wn.2d at 146. In Ryan, a statement made spontaneously to one person helped weigh the statement as not trustworthy. See 103 Wn.2d at 176.

The trial court here analyzed each Ryan factor. First, whether Brock had a motive to lie did not apply here. Second, on Brock's general character, the judge stated, "[W]hat we heard about that was that Mr. Brock said a lot of stuff that wasn't true -- that's a negative indicator." Third, only one person heard the statements, which, following Ryan, weighs against trustworthiness. Fourth, the statements were not spontaneous, they were part of a conversation; the trial court stated this factor did not apply here. Fifth, the timing of the statement was unknown, and Brock was saying it to a trusted person, which weighs towards trustworthiness. The trial court noted the difficulty of analyzing the sixth factor. The statement was not an express assertion of past fact at the time it was made, and appeared to be problematic due to its prospective hypothetical nature. Seventh, cross-examination would not help, as Brock was deceased. Eighth, the possibility of

14

whether Brock's recollection was faulty does not apply, as he was not stating something that happened in the past. Ninth, and finally, the factor looking to the circumstances surrounding the statement to see if the declarant misrepresented their involvement did not apply. Overall, the trial court stated, "As I review these Ryan factors, it really underscores what appears to be a problematic statement. I'm going to disallow the evidence because I don't think there are indications of trustworthiness." We agree that under the Ryan factors, the statement was not a statement against interest.

The trial court did not abuse its discretion in excluding Walker's previous testimony about the statement by Ahern. Bianchi was not deprived of his constitutional right to present his theory of the case nor his defense.

III.  Ineffective Assistance of Counsel

Bianchi argues that defense counsel failed to raise the proper objection to inadmissible evidence at the second trial, amounting to ineffective assistance of counsel. We review an ineffective assistance of counsel claim de novo. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution both assure the right to effective assistance of counsel. State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). The constitutional right to effective assistance of counsel is analyzed by the Strickland test, which determines whether or not errors rise to a level of ineffective assistance, and is two-pronged. In re Pers. Restraint of Crace, 174 Wn.2d 835, 840, 280 P.3d 1102 (2012); Strickland v. Washington, 466 U.S. 668, 691-92, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

15

The defendant must show that (1) deficient performance caused (2) prejudice. Strickland, 466 U.S. at 687.

To prove deficiency, the appellant must show that counsel fell below a minimum objective standard of reasonable attorney conduct. State v. Jones, 183 Wn.2d 327, 339, 352 P.3d 776 (2015). To prove prejudice, the defendant must demonstrate that the trial outcome would have been different if not for defense counsel's mistake. Id.

The State called Donna Nightingale to testify about Ahern, her significant other. She testified that Ahern expressed an interest in killing police officers when they watched their favorite movie Natural Born Killers together.[5] Nightingale said Ahern thought it was "cool" when the movie characters killed police officers. She stated it was the first movie they watched together. They had been together two years. She implied they had watched it multiple times but did not testify that they had watched it shortly before the robbery.

Before Nightingale testified, the trial court reviewed the admissibility of the statement. The State argued it was admissible under a state of mind exception to hearsay.[6] The judge stated,

---

[5] The trial court also stated that the State was proffering evidence from Nightingale about watching the movie Heat the night before the robbery. However, the State did not question Nightingale at trial about watching this movie.

[6] ER 803(a)(3) allows a hearsay exception for "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition." We disagree that this statement was admissible under the state of mind hearsay exception. Nightingale testified that the movie was the first she and Ahern watched together, and they had been together two years. We infer that the couple watched this long before the robbery, placing Ahern's statements at some point before the robbery as well. This does not show Ahern's existing state of mind for the crime.

16

> In particular, I think -- what the State has notified me that they're going to elicit as a statement regarding -- that he made regarding when the characters in Natural Born Killers killed police and that that was cool. I would think that's relevant as to the declarant's intent, which is at issue in this case because of the intent of Mr. Bianchi as an accomplice.
>
> So I think it's relevant and I do find it's relevant. Is there another reason why you would think that should not be admitted?

(Emphasis added). Responding to this, defense counsel objected to the testimony on the grounds of relevance.[7] The court overruled this objection, stating that the movie testimony was relevant and "probative of what Mr. Ahern's intent was in this timeframe, which is, in turn, at issue in the case." Bianchi has not assigned error to this ruling.

Bianchi argues that defense counsel should have objected to the evidence as inadmissible character evidence under ER 404(a). ER 404(a) states, "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion."

Bianchi did not assign error to the admission of the movie evidence for the purpose of showing Ahern's mental state. Therefore, the evidence was properly before the jury for that purpose. An objection stating that the evidence was character evidence, even if sustained, would not have resulted in the exclusion of the evidence. At best, the jury would have been instructed not to use the evidence for purposes of establishing his character. Since the evidence was properly before

---

[7] Relevance is governed by ER 403, which states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

the court, counsel's failure to object on character grounds cannot establish the prejudice necessary to establish an ineffective assistance claim.

IV.    Prosecutorial Misconduct

Bianchi argues that prosecutorial misconduct deprived him a fair trial. Specifically, he argues that the prosecutor misstated the law to the jury, misrepresented the defense's argument, and told the jury that it needed to hold Bianchi accountable for his actions.

Prosecutorial misconduct affects the defendant's right to a fair trial. In re Glasmann, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). To prevail on a prosecutorial misconduct claim, the defendant must show that the prosecutor's conduct was both improper and prejudicial. Id. at 704. "[I]mproper arguments should be reviewed in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given." State v. Russell, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994). To show prejudice, the defendant must demonstrate that there was a substantial likelihood that the misconduct affected the jury's verdict. Glasmann, 175 Wn.2d at 704.

If a defendant fails to object to an improper comment, the error is waived unless the comment is "so flagrant and ill intentioned" that it causes prejudice that would not be cured by a jury instruction. Id. If proven, prosecutorial misconduct is grounds for reversal where there is a substantial likelihood the improper conduct affected the jury verdict. Id. at 711.

A.  Misstatement of the Law

Bianchi argues that the prosecutor misstated the law during the closing argument at his second trial, amounting to prosecutorial misconduct.  He claims that the prosecutor erroneously stated that the jury did not need to find that Bianchi was aware of the presence of two officers in the car for him to be convicted of attempted first degree murder of Officers Zapata and Millard.  Because Bianchi did not object to this statement at trial, he has the burden to prove that the statement was so flagrant and ill-intentioned that a jury instruction could not have cured it. Id.

Bianchi was charged with attempted murder in the first degree, under statutes RCW 9A.32.030(1)(a), RCW 9A.28.020(3)(a), and RCW 9A.08.020(3). RCW 9A.32.030(1) states, "A person is guilty of murder in the first degree when: (a) With a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person."  Under RCW 9A.28.020, "A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime."  RCW 9A.28.020(3)(a) states that an attempt is a "[c]lass A felony when the crime attempted is murder in the first degree [or] murder in the second degree."  Under RCW 9A.08.020(3),

> [a] person is an accomplice of another person in the commission of
> a crime if:
>     (a) With knowledge that it will promote or facilitate the
> commission of the crime, he or she:
>     (i) Solicits, commands, encourages, or requests such other
> person to commit it; or

19

(ii) Aids or agrees to aid such other person in planning or committing it.

A person is guilty of murder in the first degree when "a substantial step was taken to criminally end someone's life." State v. Smith, 115 Wn.2d 775, 782, 801 P.2d 975 (1990) (emphasis omitted). "First degree murder is the killing of one person by another person with premeditation." State v. Mannering, 112 Wn. App. 268, 273, 48 P.3d 367 (2002), aff'd, 150 Wn.2d 277, 75 P.3d 961 (2003). The two jury instructions about attempted murder in the first degree state that the jury must find beyond a reasonable doubt that, "the act was done with the intent to commit Murder in the First Degree" of Officers Zapata and Millard.

"A prosecuting attorney commits misconduct by misstating the law." State v. Allen, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). In the closing argument, the prosecutor stated:

Now, we also don't have to prove that they knew Officers Zapata and Millard personally. For [m]urder, it doesn't have to be some vendetta that's been closely held for years and years. You don't have to know the person at all. We don't even have to prove that they knew both of them were in that vehicle. We have to prove that when they fired the guns at the police officers in the car, what their intent was. And again, that's clear from their actions. And it's clear, again, from what they brought.

(Emphasis added.) Because first degree murder requires premeditation, and because the jury instructions included an "intent to commit Murder," Bianchi and his associates needed to know that the individual police officers were in the car when they were shooting. The prosecutor misstated the law.

The burden is on Bianchi to show that this statement is flagrant, ill-intentioned, and so prejudicial that an instruction to the jury could not cure it.

20

Glasmann, 175 Wn.2d at 704. To show prejudice requires that the defendant show a substantial likelihood that the misconduct affected the jury verdict. Id. Bianchi does not argue that the court could not have instructed the jury adequately to cure this mistake, or that the jury verdict was affected by the misstatement. And, as a practical matter it would have been easy for the court to correct the State's error had Bianchi objected. Bianchi has not shown prejudice.

B. Straw Man Argument

Bianchi alleges the prosecutor mischaracterized the defense theory during rebuttal. A prosecutor has "wide latitude to argue reasonable inferences from the evidence," but must seek convictions based on probative evidence and sound reason. Id. For Bianchi to prevail on this claim, he needs to prove that these statements were improper and prejudicial. Id.

Bianchi argues:

> The prosecutor's rebuttal theme that Mr. Bianchi was trying to suggest that Officers Zapata and Millard had been lying was improper. The argument went "beyond the bounds of acceptable behavior by disparaging defense counsel." [State v. ]Thorgerson, 172 Wn.2d[ 438,] 451-52[, 258 P.3d 43 (2011)]. It also created a "straw man," mischaracterizing Mr. Bianchi's theory of the defense in order to invalidate it. [State v. ]Thierry, 190 Wn. App.[ 680,] 694[, 360 P.3d 940 (2015)]. The argument is also improper because it mischaracterized the state's burden of proof by presenting the jury with a false choice between finding that the officers were lying and finding Mr. Bianchi guilty. [State v. ]Miles, 139 Wn. App.[ 879,] 889-90[, 162 P.3d 1169 (2007)]; [State v. ]Fleming, 83 Wn. App.[ 209,] 213[, 921 P.2d 1076 (1996)].

We do not agree with Bianchi's characterization of the State's closing argument.

Bianchi's closing argument raised questions about the officers' statement about the shootings:

21

So in this case, the State has to prove to you beyond a reasonable doubt that the intent of Brock and Ahern was to kill -- that was their intent. Now, when it comes to these officers testimonies, they are wildly inconsistent with the physical evidence. But I can't say -- I'm not going to argue because I don't have proof of it. I can't prove that they're intentionally lying because I don't have evidence of it.

During rebuttal, the State made the two statements in question:

. . . . [T]here was a lot of talk about that ravine and, frankly, suggestion that the law enforcement officers in this case were lying. That is what was said -- that was a suggestion. The only inference was that Officer Zapata and Officer Millard sat up there and they lied to you about being shot at. . . .

. . . .

. . . . So all this suggestion about the ravine going to these officers' credibility -- what's the implication there that Defense was trying to make? That they're lying and therefore they weren't shot at? I mean, that's the only implication they can be making because all that matters is whether or not these officers have been shot at.

The State was responding to Bianchi's closing argument that the officers' testimony was not credible in light of the physical evidence. The defense said it could not prove that the officers were intentionally lying, which implied that they were lying. The State did not misrepresent defense counsel's arguments or the record. The State drew reasonable inferences. These statements made during rebuttal do not amount to misconduct by the prosecutor. In portions of the closing not addressed by Bianchi, the prosecutor responded directly to the strength of the evidence. And, the prosecutor properly referenced the burden of proof in the closing argument: "[I]f you are convinced beyond a reasonable doubt that I have proven these elements, it is your duty to convict the [d]efendant." These statements were not improper.

C. Accountability of Defendant

Bianchi argues that the prosecutor committed misconduct by asking the jury to hold Bianchi accountable for his actions. He argues that this statement made by the prosecutor at the first trial is improper: "[A]fter these twenty-one years, I am asking you to hold [Bianchi] accountable for what he did. I'm asking you to hold him accountable for the actions of him and his accomplices on October 17, 1997."

"Prosecutors have a duty to seek verdicts free from appeals to passion or prejudice." State v. Perez-Mejia, 134 Wn. App. 907, 915, 143 P.3d 838 (2006). Prosecutors engage in misconduct "when making an argument that appeals to jurors' fear and repudiation of criminal groups or invokes racial, ethnic, or religious prejudice as a reason to convict." Id. Additionally, "inflammatory remarks, incitements to vengeance, exhortations to join a war against crime or drugs, or appeals to prejudice or patriotism are forbidden." Id.

Bianchi cites to Perez-Mejia.[8] In that case, the prosecutor asked the jury to "send a message." Id. at 917. The prosecutor stated, "Send a message to Scorpion, to other members of his gang . . . and to all the other people who choose to dwell in the underworld of gangs. That message is we [have] had enough. We will not tolerate it any longer." Id. Elsewhere in closing argument, the prosecutor

---

[8] To further argue prosecutorial misconduct, Bianchi cites a case from New Jersey to argue that the prosecutor's statement about holding Bianchi accountable misstates the jury's role, which should be only to weigh the evidence and hold the state to its burden of proof, instead of considering accountability. State v. Neal, 361 N.J. Super. 522, 537, 836 A.2d 723 (App. Div. 2003). This case is not controlling in Washington. He also argues that this statement had an "inflammatory effect on the jury," is not curable by instruction, and is flagrant and ill intentioned. However, Bianchi just states these allegations without other legal argument.

made statements about the defendant's ethnicity.  Id. at 918.  In Perez-Mejia, the "send a message" language improperly injected issues about nationality and ethnicity, bringing up issues of racial prejudice.  Id. at 917-18.

However, Perez-Mejia is inapposite.  First, the prosecutor stating, "I'm asking you to hold him accountable" does not raise any issues of the racial prejudice that was found improper in Perez-Mejia.  Nor did the prosecutor appeal to the passion and prejudice of the jury generally.  Second, the prosecutor in Perez-Mejia asking the jury to "send a message" to gang members differs from asking the jury to "hold the defendant accountable" based on the evidence.  Conviction and sentencing are by nature holding one accountable for criminal acts.

We hold there was no prosecutorial misconduct.

V.   Malicious Explosion

A.   Insufficient Evidence

Bianchi argues that the State presented insufficient evidence for a rational jury to find him guilty of second degree malicious explosion beyond a reasonable doubt.  "[E]vidence is sufficient if a rational trier of fact could find each element of the crime beyond a reasonable doubt."  State v. Jussila, 197 Wn. App. 908, 932, 392 P.3d 1108 (2017).  Both direct and indirect evidence can support the jury's verdict.  Id.  We draw all reasonable inferences in favor of the State.  Id.

Bianchi was charged with malicious explosion in the second degree under RCW 70.74.280(2),[9] which states,

---

[9] Bianchi was also charged under RCW 9A.08.020(3), for being an accomplice to the crime.

A person who maliciously, by the explosion of gunpowder or any other explosive substance or material, destroy or damage any building, car, airplane, vessel, common carrier, railroad track, or public utility transmission system or structure is guilty of:

. . . .

(2) Malicious explosion of a substance in the second degree if the offense is committed under circumstances not amounting to malicious explosion of a substance in the first degree and if thereby the life or safety of a human being is endangered. Malicious explosion of a substance in the second degree is a class A felony.

Bianchi argues that because McGregor's life or safety was not endangered, a rational jury could not find that Bianchi was guilty of malicious explosion.

The question before us concerns what qualifies as "endangered" for the purposes of the statute, and whether the evidence before the jury demonstrates endangerment. "Construction of a statute is a question of law." State v. Engel, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009). To determine the legislative intent, we look to the plain language of the statute, the context of the statute, and the statutory scheme. State v. Feely, 192 Wn. App. 751, 761, 368 P.3d 514 (2016). "Where the language of a statute is clear, legislative intent is derived from the language of the statute alone." Engel, 166 Wn.2d at 578.

The plain language of the statute reads that malicious explosion in the second degree occurs "if thereby the life or safety of a human being is endangered." RCW 70.74.280. The statute does not require injury. "Endangered" is not defined, so we may consider its ordinary meaning. Feely, 192 Wn. App at 761. "Endangered" is defined as, "[t]he act or an instance of putting someone or something in danger; exposure to danger or harm." BLACK'S LAW DICTIONARY 667

(11th ed. 2019). The evidence must show that a person was exposed to danger by the explosion.

We look to the evidence to see if the jury could have found beyond a reasonable doubt that the safety of any person may have been exposed to danger by the bomb Bianchi placed. See Jussila, 197 Wn. App. at 932. Bianchi, Brock, and Ahern placed the bomb behind a Kmart store. Bianchi stated that he "[j]ust wanted to make a loud boom, draw some attention, and get people there." At trial, the State called McGregor to testify about the explosion. McGregor was a truck driver who was parked in the Kmart alley when the explosion occurred. He had just pulled into the loading dock area to make a delivery when he heard something "quite loud," like a bomb exploding, which startled him. McGregor was not injured, and his truck was not damaged.

The State also called Vancouver Fire Department Division Chief Richard Atkins to testify. He was dispatched to investigate the explosion after it occurred. Atkins corroborated that the explosion occurred in an alleyway behind the Kmart, near a trailer. He testified that there was evidence of shrapnel damage, and that the force of the explosion bent sheet metal near the detonation site.

Truckers like McGregor used the area to unload product being delivered to the Kmart. The explosion was strong enough to bend sheet metal on the trailer that was nearby. The explosion sent shrapnel flying. The jury could readily find from this evidence that the explosion exposed McGregor or any other truck driver in the vicinity at the time to danger or harm. The State presented sufficient

evidence from which a reasonable jury could find Bianchi guilty of malicious explosion.

B.  Charging Language

Bianchi argues that the charging language for malicious explosion failed to allege critical facts, violating his Sixth Amendment rights.  He alleges that the charging language is too vague, as it omitted critical facts about the building or structure he damaged, and the person he endangered.

The Sixth Amendment gives the accused the right "to be informed of the nature and cause of the accusation."  U.S. CONST. AMEND. VI. We review a challenge to the sufficiency of the charging document de novo.  See State v. Campbell, 125 Wn.2d 797, 800, 888 P.2d 1185 (1995).  If the defendant challenges the sufficiency of an information for the first time on appeal, the court construes the document liberally in favor of validity.[10]  State v. Brown, 169 Wn.2d 195, 197, 234 P.3d 212 (2010).  When looking to whether the information is sufficient, we conduct a two prong test.  State v. Rivas, 168 Wn. App. 882, 887, 278 P.3d 686 (2012).  The test includes "(1) do the necessary elements appear in any form, or by fair construction can they be found in the information and, if so, (2) can the

---

[10] The State argues that, because this is the first time Bianchi is raising this argument, the Court should decline to review this issue.  A vague charging document can be corrected by requesting a bill of particulars at trial.  State v. Leach, 113 Wn.2d 679, 687, 782 P.2d 552 (1989), abrogated on other grounds by State v. Pry, 194 Wn.2d 745, 761-62, 452 P.3d 536 (2019).  However, if a defendant fails to request a bill of particulars at trial, they cannot challenge the charging document on vagueness grounds on appeal.  Id.  Bianchi did not state that he requested a bill of particulars at trial.  The bill of particulars issue was not raised in State v. Brown, 169 Wn.2d 195, 197, 234 P.3d 212 (2010).  So, in an abundance of caution, we consider the merits.

defendant show he or she was actually prejudiced by the vague or inartful language." Id. "[I]f the necessary facts appear in any form, or by a fair construction can be found within the terms of the charge, then the charging document will be upheld on appeal." State v. Kjorsvik, 117 Wn.2d 93, 104, 812 P.2d 86 (1991). Failing to allege specific facts may make the charging document vague, but that does not make it constitutionally deficient. State v. Laramie, 141 Wn. App. 332, 340, 169 P.3d 859 (2007).

The charging language in question states,

COUNT 12 – MALICIOUS EXPLOSION OF A SUBSTANCE IN THE SECOND DEGREE – 9A.080.020(3)/70.74.280(2)

That he, RONALD JAY BIANCHI, together and with others, in the County of Clark, State of Washington, on or about October 17, 1997, did maliciously destroy or damage any building or structure by the explosion of gunpowder or any other explosive substance or material and thereby did endanger the life or safety of any human being, contrary to Revised Code of Washington 70.74.280(2) and/or was an accomplice to said crime pursuant to RCW 9A.08.020.

This language follows the language of RCW 70.74.280 closely to identify the elements of the crime. Bianchi is correct that the charging language does not identify the structure damaged or the people endangered.[11] But, Bianchi does not identify how any missing facts prejudiced his ability to defend against the charge.

_____

[11] In State v. Woodhouse, 151 Wash. 512, 513, 276 P. 539 (1929), the Supreme Court of Washington analyzed a different, lesser crime, but in a similar factual scenario. In that case, the sufficiency of the information was challenged because the charging information did not specifically state who was injured or endangered by a bomb. Id. at 513-14. The court held the information was sufficient stating, "Explosions are very likely to injure individuals. They may cause extensive and dangerous fires, they may result in panics among crowds in places of public resort, or in congested streets, and they constitute grave menaces to the public safety and security." Id. at 515, 517.

In fact, he does not actually argue that he was prejudiced. Therefore, Bianchi fails to show that the charging document was constitutionally insufficient.

### C. Jury Instructions

In his SAG, Bianchi argues that the jury instruction for malicious explosion misstated the law. He argues that the words "if" and "is" are included in the statute, but left out in the jury instructions and this omission changes the meaning of the law. "Jury instructions are sufficient if they are supported by substantial evidence, allow the parties to argue their theories of the case, and when read as a whole properly inform the jury of the applicable law." State v. Clausing, 147 Wn.2d 620, 626, 56 P.3d 550 (2002).

With the language of concern emphasized, RCW 70.74.280 reads,

> A person who maliciously, by the explosion of gunpowder or any other explosive substance or material, destroy or damage any building, car, airplane, vessel, common carrier, railroad track, or public utility transmission system or structure is guilty of:
>
> . . . .
>
> (2) Malicious explosion of a substance in the second degree if the offense is committed under circumstances not amounting to malicious explosion of a substance in the first degree and if thereby the life or safety of a human being is endangered.

The jury instruction reads,

> A person commits the crime of Malicious Explosion of a Substance in the Second Degree when the person maliciously destroys or damages any building or structure by the explosion of gunpowder or any other explosive substance or material and thereby endangered the life or safety of a human being.

Bianchi is correct that the jury instruction does not perfectly match the statute.

29

However, the instruction allowed both parties to argue the theory of their case. Bianchi argued that no human was actually endangered by the explosion, while the State argued that no one actually needed to be hurt, but that someone was endangered. Additionally, Bianchi does not establish that the omission of the two words changed the meaning of the instruction. This does not show any error or prejudice. The jury was properly informed of the applicable law, and the instruction is sufficient.

VI.   Double Jeopardy

Bianchi was found guilty of possession of stolen property in the second degree. Bianchi was charged under RCW 9A.56.160 for both counts,[12] which states,

> (1) A person is guilty of possessing stolen property in the second degree if:
>
> (a) He or she possesses stolen property, other than a firearm as defined in RCW 9.41.010 or a motor vehicle, which exceeds seven hundred fifty dollars in value but does not exceed five thousand dollars in value.

The stolen property included a Chevy Camaro, belonging to Sandra Ouellette, and a Ford Mustang, belonging to David Sooder. In his SAG, Bianchi argues that simultaneous possession of various items of property stolen from multiple owners constitutes the same offense for double jeopardy purposes. The State did not respond to this pleading.

---

[12] Bianchi was also charged with RCW 9A.08.020(3), for being an accomplice to the crime, and RCW 9A.56.140, which defines the crime.

30

Bianchi, in his SAG, relies on State v. McReynolds, 117 Wn. App. 309, 340, 71 P.3d 663 (2003) to argue that simultaneous possession of various items of property stolen from multiple owners constitutes one unit of prosecution of the crime. McReynolds held that a single possession of various items of stolen property was one unit of prosecution, and therefore multiple convictions for possessing that property violated the prohibition against double jeopardy. Id. McReynolds further states, "when a statute defines a crime as a course of conduct over a period of time, 'then it is a continuous offense and any conviction or acquittal based on a portion of that course of action will bar prosecution on the remainder.'" Id. at 339 (quoting Harrell v. Israel, 478 F. Supp. 752, 754-55 (E.D. Wis.1979)).

The evidence shows that Bianchi admitted to taking the two vehicles. Bianchi admitted to parking the cars at different locations the night before the robbery. It is clear from the record that all three men rode in the vehicles during the course of the robbery. The three men drove the Camaro to set the bomb. They fled the scene of the robbery in the LeBaron, and drove that car to the Mustang. After the men got into the Mustang to leave the vicinity, a police car started to follow them. Bianchi drove the Mustang while Brock and Ahern fired upon Sergeant Hogman. These facts demonstrate that Bianchi and his accomplices had control over the vehicles from the act of stealing them through the time the cars were used in the robbery and attempted escape.

We conclude that the possession of these two vehicles constitutes a single unit of prosecution. Charging them separately violates double jeopardy. Bianchi is entitled to be resentenced on a single count.

VII.    Cumulative Error

Bianchi argues that his case should be reversed due to cumulative error. Cumulative error warrants reversal when the combined effect of several errors denies the defendant a fair trial.  State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000).  "The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial."  State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).  Bianchi does not illustrate how cumulative error would have affected the outcome of the trial.  He also does not show that any prejudice against him occurred at trial.  Cumulative error does not apply.

Affirmed in part, reversed in part, and remanded to correct the sentence.

_Appelwick, J._

WE CONCUR:

32